IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| McDONNELL DOUGLAS CORPORATION<br>and GENERAL DYNAMICS CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 91-1204C<br>(Senior Judge Robert H. Hodges, Jr.) |

**DEFENDANT'S MOTION TO LEAVE TO FILE REPLY**

The defendant hereby requests the Court to grant leave for defendant to file a reply brief to plaintiffs' Response of McDonnell Douglas Corporation and General Dynamics Corporation, filed July 6, 2006.

We have contacted plaintiffs to ascertain their position with respect to this motion for leave and, at their request, include the following statement from plaintiffs:

> After multiple hearings at which both sides gave comprehensive argument and the Court has already allowed each side one closing brief, "enough is enough," and further briefing is unnecessary. However, Plaintiffs do not object to Defendant's proposed filing, so long as it is limited to no more than 10 pages and raises no new issues.

We request leave to file this reply brief because we believe that the exchange of briefs, following the recent arguments, has permitted the parties to clarify and synthesize their respective positions. In that regard, we hope this round of briefing will be assistance to the Court. As the United States is the party who bears the burden of proof under *Lisbon Contractors*, it is appropriate that the United States have an opportunity to reply to plaintiffs' response brief. *See generally* RCFC 5.2 (describing "initial," "opposition," and "reply" briefs).

For these reasons, the defendant respectfully requests that the Court grant leave and permit defendant to file its rely brief.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Bryant G. Snee
BRYANT G. SNEE
PATRICIA M. McCARTHY
Assistant Directors
ALAN J. LO RE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tele. (202) 514-7300
Fax (202) 514-8624

Attorneys for Defendant

Dated: July 21, 2006

No. 91-1204C
(Judge Robert H. Hodges, Jr.)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

McDONNELL DOUGLAS CORPORATION
and GENERAL DYNAMICS CORPORATION,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S SUPPLEMENTAL BRIEF**

---

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

BRYANT G. SNEE
PATRICIA M. McCARTHY
Assistant Directors

ALAN J. LO RE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tele. (202) 514-7300
Fax (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

WENDELL A. KJOS

MARK A. ROMANO

Office of General Counsel
Department of the Navy

Dated: July 21, 2006

## TABLE OF CONTENTS

I. The Navy Did Not Waive Its Right To Terminate For Failure To Make Progress .......... 1

A. Plaintiffs' Waiver Argument Contradicts Settled Precedent .......... 1

B. Waiver Law Recognizes No Exception For Research And Development Contracts .......... 5

C. To Establish A Six-Year Unilateral Schedule Satisfying The Requirements Of *DeVito* Would Not Have Been "Easy" .......... 6

II. Plaintiffs Failed To Provide Adequate Assurances Regarding P00046 .......... 9

III. Plaintiffs Cannot Escape The Contract's Requirement That A Loss Adjustment Be Applied In The Event The Default Termination Is Overturned . 10

A. Resolution Of The Loss Adjustment Issue Is Not Affected By The State Secrets Invocation .......... 11

B. Incremental Funding Of The A-12 Contract Did Not Vitiate The Contract's Loss Adjustment Provision .......... 15

## TABLE OF AUTHORITIES

## CASES

Action Support Servs. Corp.,
ASBCA Nos. 46524, 46800, 00-1,
BCA ¶ 30,701 (2000) ........ 1, 8

Container Sys. Corp., Inc.,
ASBCA No. 40611,
94-1 BCA ¶ 26,354 (1993) ........ 1, 8

Danzig v. AEC Corp.,
224 F.3d 1333 (Fed. Cir. 2000) ........ 10

DeVito v. United States,
413 F.2d 1147 (Ct. Cl. 1969) ........ 4, 9

E.O. Mfg. Co. Inc.,
ASBCA No. 52,120,
01-2 BCA ¶ 31,587 (2001) ........ 1, 8

Flameco Eng'g, Inc.,
ASBCA No. 39337,
92-1 BCA ¶ 24,518 (1991) ........ 1, 8

Lapp Insulator Co., Inc.,
ASBCA No. 13303,
70-1 BCA ¶ 8219 (1970) ........ 1, 8

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987) ........ 4

McDonnell Douglas Corp. v. United States ,
323 F.3d 1006 (Fed. Cir. 2003) ........ 4, 10, 13

McDonnell Douglas Corp. v. United States,
37 Fed. Cl. 270 (1996) ........ 12, 13

McDonnell Douglas Corp. v. United States,
50 Fed. Cl. 311 (2001) ........ 13

McDonnell Douglas Corp. v. United States,
182 F.3d 1319 (Fed. Cir. 1999) ........ 12, 15, 16

NVT Technologies, Inc. v. U.S.,
370 F.3d 1153 (Fed. Cir. 2004) .......... 16

New England Tank Indus. of N.H., Inc. v. United States,
861 F.2d 685 (Fed. Cir. 1988) .......... 8, 9

Novelty Products Co.,
ASBCA No.
78-1 BCA ¶ 12,989 .......... 8

Prestex, Inc.,
ASBCA Nos. 21284, et al.,
81-1 BCA ¶ 14,882 (1980) .......... 1, 8

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994) .......... 4

**STATUTES**

41 U.S.C. § 605(a) .......... 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| McDONNELL DOUGLAS CORPORATION<br>and GENERAL DYNAMICS CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br>No. 91-1204C<br>(Judge Robert H. Hodges, Jr.) |

**DEFENDANT'S SUPPLEMENTAL BRIEF**

Defendant, the United States, respectfully submits the following proposed supplemental brief responding to certain new statements contained in plaintiffs' response brief filed July 6, 2006.

## I. The Navy Did Not Waive Its Right To Terminate For Failure To Make Progress

### A. Plaintiffs' Waiver Argument Contradicts Settled Precedent

Each of the 87 Contract Line Item ("CLIN") contained in the A-12 contract specified a delivery date or dates. A waiver of a delivery date for a separate deliverable item does not waive the delivery dates for other separate deliverables. *See* Pl. Resp. at 6 (citing *Novelty Products Co.*, 78-1 BCA ¶ 12,989 (ASBCA 1978)); *see also, E.O. Mfg. Co. Inc.*, ASBCA No. 52,120, 01-2 BCA ¶ 31,587 (2001) (citing *Lapp Insulator Co., Inc.*, ASBCA No. 13303, 70-1 BCA ¶ 8219 (1970); *Action Support Servs. Corp.*, ASBCA Nos. 46524, 46800, 00-1 BCA ¶ 30,701 at 151,684 (2000); *Container Sys. Corp., Inc.*, ASBCA No. 40611, 94-1 BCA ¶ 26,354 (1993) (citing *Prestex, Inc.*, ASBCA Nos. 21284, et al., 81-1 BCA ¶ 14,882 (1980)); *Flameco Eng'g, Inc.*, ASBCA No. 39337, 92-1 BCA ¶ 24,518 (1991).

Plaintiffs contend that, despite the delivery dates specified for each CLIN, the A-12 contract did not provide for separate deliverables. Instead, they contend, without citation to any authority, that the A-12 contract was a special type of contract – a "development contract." Pl. Resp. at 6. According to plaintiffs, pursuant to this special type of contract, a waiver of one delivery date waives all other delivery dates contained in the contract.

Plaintiffs' contention that the contract does not provide for separate deliverable items is logically inconsistent with their simultaneous contention that the Navy waived the delivery date for the first aircraft after plaintiffs failed to deliver the first aircraft in June 1990, the date specified in the contract. By contending that a waiver of the Government's right to terminate the contract for failure to make progress occurred after they missed the first flight date, and the Navy did not promptly terminate the contract for default, plaintiffs necessarily concede that the Navy had the right to terminate the entire contract for default in June 1990, when they missed first flight. By conceding that the Navy possessed the right to terminate for default in June 1990, plaintiffs necessarily concede that the first aircraft was a separate deliverable item. If aircraft one had not been a separate deliverable item, the Navy would not have possessed the acknowledged right to terminate for default based upon missed deliveries in the summer of 1990.

Moreover, because the CLINs identified separate deliverable items, a failure to terminate for the failure to deliver one item on the date specified by the contract did not waive other, much less all, of the dates for the remaining deliverables specified in the contract. Plaintiffs have failed to identify a single case that holds that a waiver of one delivery date waives all of the remaining delivery dates, and, in fact, their contention is directly contrary to settled board law cited above.

The only cases that plaintiffs cite to the contrary are cases in which the contractor demonstrated that it reasonably interpreted the waiver of the due date of one item as a waiver of the other dates and that it relied to its detriment upon this interpretation. *See* Pl. Resp. at 6-14 (citations omitted). Here, plaintiffs contend that they are not obligated to demonstrate that they relied upon the Navy's failure to terminate the contract as a waiver of the entire contractual schedule after plaintiffs missed the date for first flight, *id.* at 8, but they cite no precedent that relieves them from this burden.

Neither authority nor logic allows plaintiffs to establish a waiver of a six-year schedule of numerous specified individual performance dates based upon a failure to terminate in the summer of 1990 due to missed deliveries. Plaintiffs, therefore, are forced to contend that the Navy's issuance of the valid and enforceable P00046, alone, waived the Navy's right to terminate the contract for failure to make progress because P00046 did not establish new delivery dates for all of the items that were to be delivered after the first eight aircraft. As before, plaintiffs cite no precedent that supports this theory, and they fail to establish that they were prejudiced in any manner by the fact that P00046 did not contain new dates for all of the remaining CLINs.[1] They admit that they did not agree and would not have agreed to any particular dates for the contract's remaining CLINs at the time of P00046. The fact is that plaintiffs faced near term responsibilities specified by P00046, but acted as if they were in a holding pattern, waiting (and hoping) for a revision of the contract that never occurred. Under these circumstances, plaintiffs essentially contend that the Navy should have performed a useless

---

1 Plaintiffs do not contend that they were confused or harmed by the fact that, after P00046, the contract appeared to call for the delivery of the Lot I aircraft before the first eight aircraft. Pl. Resp. Br. at 9.

gesture by engaging in the resource intensive effort of establishing a new schedule to which plaintiffs would not agree, towards which plaintiffs would not have worked, and which would have been revised again when and if the remaining contract had been restructured.

Further, plaintiffs' waiver argument is based upon a fundamental confusion of the requirements of *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987), with those of *DeVito v. United States*, 413 F.2d 1147 (Ct. Cl. 1969). Assuming, for argument's sake, that *Lisbon* requires the existence of an overall "completion date" in order to uphold a termination for failure to make progress, the contract contains one because, in fact, P00046 retained the completion date specified in the contract.[2] *See* Def. Post-Arg. Br. at 18-20. Plaintiffs' admitted inability to perform to the P00046 schedule is, in effect, a *prima facie* admission that they were not making progress toward the ultimate end item, and it is encumbent upon plaintiffs to demonstrate otherwise. In any event, plaintiffs fail to cite ***any*** case that holds that a non-breaching party is required to re-establish a schedule for delivery dates that have not been missed. As we have previously demonstrated, the waiver portion of the 2003 court of appeals decision upon which plaintiffs rely does not refer to "completion date" of the entire contractual effort, but rather to "completion date" for the missed first delivery date. *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1019 (Fed. Cir. 2003). None of the board cases

---

2 Contrary to the unambiguous direction of the Federal Circuit to apply the *Lisbon* standard *de novo* upon remand, *McDonnell Douglas*, 323 F.3d 1006, 1018 n.3 (Fed. Cir. 2003) (citing *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc)), plaintiffs contend that "the Navy did not mention the June 1996 completion date, either expressly or by implication, in either its cure notice or its termination notice." Pl. Resp. at 22. The Navy was never obliged to mention any completion date under the Contract Disputes Act, which provides that "[s]pecific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding." 41 U.S.C. § 605(a).

cited by plaintiffs establishes the proposition that a non-breaching party is required to establish a schedule for dates other than those missed.

**B. Waiver Law Recognizes No Exception For Research And Development Contracts**

In reality, plaintiffs contend that the law ***should*** recognize an exception for research and development contract cases and impose upon the Government a special requirement to reset an entire schedule once a specified delivery date is missed. Pl. Resp. at 6 (purporting to distinguish precedent involving what plaintiffs call "installment contracts"). In making this contention, plaintiffs echo a similar argument that Professor Ralph Nash attempted to make as *amicus curiae* (on behalf of the Aerospace Industries Association) in one of the appeals in this case, which is that the law should accord special treatment to research and development contracts and distinguish them from so-called "installment contracts." Of course, there is no special rule in Government contracts law that distinguishes research and development contracts from installment contracts, and the United States Court of Appeals for the Federal Circuit declined to consider Professor Nash's arguments.

In any event, the fact remains that the contract here bears no resemblance to the special contract posited by Professor Nash. Here, plaintiffs agreed to a contract which, like an "installment" contract, contained specified performance dates that they were unequivocally required to meet. Thus, having signed a contract with specified performance dates, they are bound to the law that applies to such contracts. Even if plaintiffs were correct that the law ought to recognize that some research and development contracts are special and exempt from the application of traditional rules of contracting, plaintiffs would still be liable here because they willingly signed a research and development contract with specific installment delivery dates. If

plaintiffs did not wish to be bound to a contract that was structured as an "installment contract," then they should not have signed the contract.

### C. To Establish A Six-Year Unilateral Schedule Satisfying The Requirements Of *DeVito* Would Not Have Been "Easy"

Plaintiffs do not contend that they could have met or even would have worked toward a unilaterally promulgated schedule for all of the remaining CLINs in the contract. Nonetheless, they contend that the Navy made a multi-billion dollar gaffe by failing to take the futile and formalistic step of incorporating one of Captain Elberfeld's draft schedules into a unilateral contract modification. Plaintiffs' contentions that the Navy simply could have imposed the notional schedules sketched by Captain Elberfeld in the fall of 1990 lack merit.

As an initial matter, plaintiffs, not the Navy, developed the detailed delivery and performance schedules in the A-12 contract. It was within the Navy's capacity to set top-level program schedules, reflecting major Navy milestone requirements (such as First Flight, aircraft deliveries, TECHEVAL, OPEVAL, etc.). *See e.g.*, APP. 24,818-20; *compare* Pl. Resp. at 15 (referring to the Navy's fall 1990 "tentative schedule for contract completion."). But, importantly, the contract imposed upon plaintiffs the continuing responsibility to develop the detailed manufacturing, testing, and delivery schedules reflected in the 87 CLINs in Schedule F of the contract because plaintiffs, alone, knew the manner and means that they intended to employ to accomplish all of the contract requirements. APP. 24,797-98 ("The Contractor shall prepare a Master Schedule for the ATA project. This schedule shall include all critical activities necessary to complete the work required by the contract."). Thus, the Navy was no better able to develop a comprehensive schedule in the summer, or even the fall, of 1990 than it was at award. Thus, the contract placed the burden upon plaintiffs to promulgate a schedule.

Moreover, the Navy alone lacked the authority to reschedule the entire contract. Plaintiffs assert incorrectly that "the Navy" possessed the authority to unilaterally enlarge the entire schedule in the fall of 1990. Pl. Resp. at 15. In fact, due to its size and importance to national defense, the Defense Department ("DOD") possessed "milestone decision-making authority" regarding the A-12 program. DOD Directives 5000.1, 5000.2 (1987). Plaintiffs were well aware of the fact that the Defense Acquisition Board ("DAB"), chaired by the Under Secretary of Defense (Acquisition), was to review the A-12 program at the end of each of the concept formulation, demonstration/validation, and FSD stages, and recommend to the Secretary of Defense, at each "milestone," whether the program should proceed into the next phase. APP. 15,354-56; 15,365-69. Here, the DAB issued a "program baseline" prescribing budget and schedule thresholds for managing the program during the FSD phase. DOD Directive 5000.45 (1986); APP. 14,440-43; 15,343-46. Captain Elberfeld, the Navy's A-12 program manager, was required to report any breach in this baseline. APP. 14,441; 15,345-46. Approval by the Under Secretary, as chairman of the DAB, was required to effect any modification of the program baseline. APP. 15,345-46; 15,359.

Thus, because the program baseline included, among other dates, the deadlines for first flight and TECHEVAL, the Navy was without authority to unilaterally modify the contractual schedule without approval of the Under Secretary. In August 1990, the Navy obtained such approval with regard to the issuance of modification P00046, which extended the first flight date. *See* APP. 77,315-17; *see also* APP. 2,377-78. Although the Under Secretary might have approved a unilateral modification of a different scope in 1990, plaintiffs are incorrect when they

assert that the Navy alone possessed authority to restructure the contract in 1990. *See* Pl. Resp. at 15.

In any event, the fact is that the original schedule, except for the dates specified in P00046, remained in effect at the time of termination. Plaintiffs signed a contract with specified performance dates, and they are bound by the law that applies to such contracts. *See Novelty Products Co.*, 78-1 BCA ¶ 12,989; *E.O. Mfg.*, 01-2 BCA ¶ 31,587; *Lapp Insulator*, 70-1 BCA ¶ 8219; *Action Support*, 00-1 BCA ¶ 30,701 at 151,684; *Container Sys.*, 94-1 BCA ¶ 26,354; *Prestex*, 81-1 BCA ¶ 14,882 (1980); *Flameco Eng'g*, 92-1 BCA ¶ 24,518 (1991). Even if the entire schedule did not remain in effect, both this Court and the court of appeals have held that P00046 was enforceable. That modification necessarily provides a basis for measuring plaintiffs' progress and that is all that is required. To argue otherwise is to contend that the Federal Circuit knowingly held that P00046 was enforceable for no purpose. Plaintiffs' contention that the court of appeals was laboring under the elemental misunderstanding that – directly contrary to the explicit contentions of all parties – P00046 somehow encompassed the entire contractual effort, is baseless.

Finally, plaintiffs' response, in a footnote, to our demonstration that a unilateral modification of the entire delivery schedule would have voided the valuable production options for which the Navy bargained, *see, e.g., New England Tank Indus. of N.H., Inc. v. United States*, 861 F.2d 685, 687 (Fed. Cir. 1988) ("to properly exercise [an] option, the government's acceptance of the offer had to be unconditional and in exact accord with the terms of the contract[.]"), is non-responsive. Pl. Resp. at 15 n.3. Without elaboration, plaintiffs merely state that "the government was required to exercise its options long before it completed OPEVAL, its

tests for operational suitability." *Id.* By omission, therefore, plaintiffs impliedly concede the merit of our argument: the law did not require the Navy to unilaterally reset the entire schedule because, by changing the overall schedule unilaterally, the Navy necessarily would have changed the scheduled delivery dates for the optioned aircraft ***prior to*** exercise of the options. Under settled precedent, such a unilateral modification of the overall schedule would have changed the terms of the contract, and necessarily would have prevented the Navy from "properly exercis[ing]" the options. *See New England Tank*, 861 F.2d at 687. Nothing in *DeVito* requires the Government to void its options in order to preserve its rights under the default clause. Plaintiffs do not deny this critical point.

In summary, not even plaintiffs contend that the Navy knowingly relinquished its right to terminate the contract for failure to make progress. Certainly, the Navy did not issue P00046 with the intention of forfeiting its default rights under the contract. Rather, plaintiffs appear to accuse the Navy of simple ineptitude in attempting to preserve its rights. Further, unlike any other plaintiff seeking to establish a waiver claim, plaintiffs here disavow any obligation to establish detrimental reliance, because they know full well that changing notional schedules for an aircraft they were not going to be building for months or years (or never, if negotiations failed, as they did), does not constitute detrimental reliance. Plaintiffs did not establish that they did anything differently based upon a Navy act or omission. None of plaintiffs' allegations invoke the essence of the waiver doctrine.

## II. <u>Plaintiffs Failed To Provide Adequate Assurances Regarding P00046</u>

Plaintiffs contend incorrectly that "the government's entire argument on adequate assurances must fail because it is based on the premise that the contractors failed to provide

adequate assurances that they would meet the *original* specifications and the *original* contract schedule, which were no longer in effect at termination." Pl. Resp. at 26 n.14 (emphasis in original). Plaintiffs' use of the word "entire" is wrong.

Even assuming, for argument's sake, that the "original" specifications and contract schedule were no longer in effect at termination, it is the settled law of the case that P00046 was reasonable and enforceable at termination. *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1018-20 (Fed. Cir. 2003). It is undisputed that the Navy issued a cure notice requesting assurances as to, among other things, plaintiffs' performance of the revised delivery schedule. APP. 72,338. In response to the cure notice, plaintiffs stated unequivocally that they "will not meet delivery schedules or certain specifications of the original contract, ***or the revised FSD delivery schedule unilaterally imposed by a Navy contract modification*** . . . ." APP. 74,534 (emphasis supplied). Given this, there can be no dispute that plaintiffs failed to provide adequate assurances regarding the performance of P00046, which was enforceable at termination.[3]

## III. Plaintiffs Cannot Escape The Contract's Requirement That A Loss Adjustment Be Applied In The Event The Default Termination Is Overturned

Plaintiffs lastly argue that, in the event the termination is converted to one of convenience, the Court should refuse to enforce the contract's loss adjustment provision.

---

[3] Plaintiffs incorrectly read the holding of *Danzig v. AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000), by contending that the Court is bound by the subjective beliefs of the agency. Pl. Resp. at 25. In *AEC*, the Navy did not terminate the contract for failure to provide adequate assurances, but, rather, for failure to make progress and for default in performance. *Id.* at 1336. Although the Navy asserted repudiation as an independent basis upon which to sustain the default, the board of contracts appeals rejected that argument. *Id.* The Federal Circuit reversed the board's holding rejecting the Government's repudiation argument, "as a matter of law." *Id.* at 1339. Contrary to plaintiffs' contentions, nowhere in its opinion did the Federal Circuit in *AEC* make findings of fact – in the first instance – regarding the Navy's subjective lack of assurances. *See* Pl. Resp. at 25.

According to plaintiffs, "national security concerns" related to the Government's invocation of the State Secrets doctrine precludes the litigation of the loss adjustment dispute, Pl. Resp. at 27-29, and, alternatively, the fact that the contract was incrementally-funded prevents the application of the loss adjustment provision, Pl. Resp. at 30-31. Plaintiffs are wrong on both points.

In the A-12 contract, the parties agreed that if a default termination were converted to a convenience termination and if plaintiffs were in a loss position, then a loss adjustment would apply to any convenience recovery to which plaintiffs might be entitled. APP. 19,576 (incorporating FAR clause 52.249-2). Nothing in the A-12 contract, or in existing precedent, permits plaintiffs to escape that term of their bargain. Moreover, while plaintiffs argue that a loss adjustment should not be applied, if they are wrong in that regard, they do not contest that considerable additional discovery and trial proceedings would be required before the Court could resolve that issue. *See* Def. Post-Arg. Br. at 33.

### A. Resolution Of The Loss Adjustment Issue Is Not Affected By The State Secrets Invocation

Contrary to plaintiffs' suggestion, neither this Court nor the court of appeals has finally held that the Government's invocation of the State Secrets doctrine precludes the litigation of the loss adjustment dispute. Although this Court once so held, this Court's subsequent dismissal of plaintiffs' superior knowledge claims, affirmed by the court of appeals, removes any cloud from the Court's ability to resolve fully the loss adjustment issue. Moreover, putting aside the lawyer's argument offered by plaintiffs to date, plaintiffs have failed to make a showing on the record that the invocation of the State Secrets doctrine impedes the Court's ability to implement the A-12 contract's loss adjustment provision.

First, it is correct that this Court once held that it could not litigate the issue of loss adjustment, but that holding was predicated upon this Court's conclusion that the loss adjustment issue was bound-up with plaintiffs' equitable adjustment claims related to "superior knowledge." *McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 270, 272 (1996) ("The parties seek a trial on damages to resolve plaintiffs' entitlement to profit and defendant's imposition of a loss ratio. Their allegations about the propriety of plaintiffs' *superior knowledge claim, and the competing entitlements to profits or a loss adjustment*, can be addressed only if . . . . ")(emphasis supplied); *see generally id.* at 275-85. The Court identified three reasons why it could not permit the parties to litigate plaintiffs' superior knowledge equitable adjustment claims and concluded that "issues involving equitable adjustments, superior knowledge, profits, and loss adjustment will not be litigated further in this Court." *Id.* at 272. On appeal, the court of appeals expressly declined to consider this issue given that it had reversed this Court's liability ruling on default and it had no occasion to reach this damages issue. *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1329-30 (Fed. Cir. 1999)(referring to "these three interrelated issues" of superior knowledge, loss adjustments, and profits) *see also id.* at 1324.

On remand, this Court initially re-adopted its prior ruling in orders dated March 1, 2001 and April 27, 2001, expressly relying upon its earlier conclusion that plaintiffs' superior knowledge claim could not be litigated. APP. 428 (Order, March 1, 2001, stating that "We ruled in December 1996 that *certain issues related to superior knowledge* could not be tried because the resulting threat to national security would not permit it.")(emphasis supplied). However, following trial, the Court rejected plaintiffs' superior knowledge defense, holding that the Government's invocation of the State Secrets doctrine precluded litigation of their claims.

*McDonnell Douglas Corp. v. United States*, 50 Fed. Cl. 311, 324-25 (2001). Additionally, this Court correctly noted the Government's argument that a loss adjustment should be applied to any convenience termination was mooted given that the Court had ruled in the Government's favor sustaining the default. *Id.* at 325. The contractors appealed concerning the dismissal of their "superior knowledge" defense and the court of appeals affirmed this Court's ruling on these issues in all respects. *McDonnell Douglas*, 323 F.3d at 1020-24.

Thus, plaintiffs' superior knowledge claims are dismissed, forever, from this case. Given that the ***only*** reason this Court articulated for its refusal to consider a loss adjustment was the existence of plaintiffs' superior knowledge claims, *see generally* 37 Fed. Cl. at 272-85, there is now no bar to resolution of the loss adjustment issue. Indeed, logic (in addition to law of the case doctrine) compels this result. The Government's invocation of the State Secrets doctrine resulted in a complete dismissal, before adjudication on the merits, of one of plaintiffs' major defenses to the default termination – their superior knowledge claims. There is no basis upon which one could now conclude that plaintiffs' superior knowledge claims, now dismissed, have any relevance to or effect upon the Government's argument that a loss adjustment should be applied, in accordance with the contract provisions, in the event that the default is overturned. In short, plaintiffs' arguments about superior knowledge and the contract's loss provision became irrelevant when the court of appeals affirmed this Court's rejection of plaintiffs' superior knowledge claims. *See* 323 F. 3d at 1020-24.

Second, as a matter of fact, the issue of loss adjustment is not connected to the information over which the State Secrets doctrine was asserted and plaintiffs have made no ***showing***, on the record, that – given the dismissal of their superior knowledge claims – there is

any connection between the invocation of the State Secrets doctrine and the loss adjustment issue. While plaintiffs urge that determining an "Estimate at Completion" ("EAC") would "necessarily involve delving into the details of advanced stealth technology from other classified programs," Pl. Resp. Br. at 29, plaintiffs offer only argument without citation to any record evidence that would establish this ominous-sounding prognostication. In fact, the history of this litigation demonstrates otherwise. In the discovery prior to the 2001 default trial, the Government formally disclosed to plaintiffs our EAC position, the experts reports upon which it was based, and the supporting data. Def. Resp. To Pl. Second Set of Contention Interrogs, Interrog. No. 9 (Sept. 1, 2000). Plaintiffs took some discovery related to that position. E.g., J. Bouchard Depositions, 2/27/01 &4/18/01; T. Dickman Deposition, 4/26/01; S. Nisevich Depositions, 5/02/01 & 5/17/01; and W. Richardson Deposition, 4/254/01. Plaintiffs also disclosed their EAC position and indicated that it was being updated during litigation. *See* Pl. Resp. to 2nd Set of Contention Interrogs, Interrog. No 15(b), Sept. 5, 2000. Additionally, at the time of termination, each of the plaintiffs, as well as the Navy and DOD, seperately developed various EACs regarding the A-12 contract. *See e.g.*, *id.*; APP. 26,635, 26,647. All of these analyses, whether completed during litigation or contemporaneously with the A-12 program, were developed without regard to the invocation of the State Secrets doctrine. There is no reason why, if necessary, this Court also cannot hear and consider this same evidence. "Saber-rattling" aside, plaintiffs have failed to establish, on the record, that there now is any impediment to this Court's resolution of the loss adjustment issue.

### B. Incremental Funding Of The A-12 Contract Did Not Vitiate The Contract's Loss Adjustment Provision

Plaintiffs, again, renew their argument that because the contract was incrementally-funded, the contract's loss adjustment provision cannot be applied. Pl. Resp. at 30-31. While plaintiffs are correct that the court of appeals has not decided this very issue, *see id.* at 30, plaintiffs fail to acknowledge that the appellate court has already expressly rejected the same arguments with respect to plaintiffs' claim that the failure to make progress default clause was inapplicable. *See* 182 F.3d at 1330. Indeed, aside from other defects, plaintiffs' incremental funding argument runs counter to the most elemental rules of contract interpretation.

In the 1999 appeal, plaintiffs argued that the fact that the A-12 contract was incrementally-funded meant two things: (a) that the contract's failure to make progress clause could not be applied; and (b) that, if the termination were converted to one for convenience, the contract's loss adjustment provision could not be applied. With respect to the latter point, the appellate court declined to address the matter given that this Court's conversion of the default termination to one of convenience was reversed. *Id.* However, in the very next sentence, the court of appeals stated that the "Contractors *similarly* argue" that incremental funding of the contract prevented application of the contract's failure to make progress clause. *Id*. (emphasis added). Over the following two pages of its opinion, the appellate court firmly, and finally, dismissed plaintiffs' argument that the incremental funding clause of the contract, in any way, undermined the express language of the contract's failure to make progress clause. *Id*. at 1330-32. The same rationale would apply to plaintiffs' current argument that incremental-funding of the contract somehow rendered the loss adjustment clause of the contract inoperative.

Indeed, elemental rules of contract interpretation quickly dispatch plaintiffs' incremental funding argument. In one provision of the contract, the parties agreed that the contract would be incrementally-funded and that such funding "would permit compliance with the contract." APP. 19,397 (H-7 Clause, paras. (a) and (b)). In the same provision, the parties further expressly agreed that nothing in this clause would affect the Government's rights under the termination for convenience clause. APP. 19,398 (H-7 Clause, para. (e)). In a different clause, the termination for convenience clause, the parties agreed that if the contractors were in a loss position in the event of a convenience termination, then a loss adjustment would apply to whatever recovery they might be entitled. APP. 19,576 (incorporating FAR clause 52.249-2); *see* FAR 52.249-2 (f)(2)(iii) (requiring loss adjustment if contractor is in loss position). Given that all these clauses were contained in the parties' contract, the only reasonable, indeed rational, reading of the contract is that the loss adjustment provision would apply notwithstanding the fact that the contract was incrementally-funded. *NVT Technologies, Inc. v. U.S.*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."); *see also* 182 F.3d at 1330-32 (reading the existence of incremental-funding clause and failure to make progress clause harmoniously).

In summary, plaintiffs ask this Court to read the A-12 contract in a highly-selective manner. They first ask the Court to enforce the contract's clause which provides that, if a default termination is overturned, the contract will be treated as if it were terminated for convenience. APP. 19,576 (incorporating FAR 52.249-9); *see* FAR 52.249-9 (g). They then ask the Court to enforce the contract's clauses which afford them termination for convenience recovery for all

incurred costs, subcontractor costs, and settlement expenses. APP. 19,576 (incorporating FAR 52.249-2); *see* FAR 52.249-2 (f)(2)(i); (f)(2)(ii); & (f)(3). However, in the same breath, plaintiffs ask the Court to relieve them of their agreement that if they were in a loss position, in a convenience termination, then any recovery would be reduced by the rate of that loss. APP. 19,576 (incorporating FAR 52.249-2); see FAR 52.249-2 (f)(2)(iii). The fact that the State Secrets invocation resulted in dismissal of plaintiffs' superior knowledge claims and the fact that the A-12 contract was incrementally-funded, do not support the tortured reading of the parties' contract offered by plaintiffs.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Bryant G. Snee
BRYANT G. SNEE
PATRICIA M. McCARTHY
Assistant Directors
ALAN J. LO RE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, DC 20530
Tele. (202) 514-7300
Fax (202) 514-8624
Attorneys for Defendant

OF COUNSEL:

WENDELL A. KJOS
MARK A. ROMANO

Office of General Counsel
Department of the Navy

Dated: July 21, 2006