# In the United States Court of Federal Claims

No. 91-1204C
Filed: May 3, 2007

| | |
|---|---|
| * * * * * * * * | Navy Procurement; A-12 "Avenger"; Stealth Technology; |
| MCDONNELL DOUGLAS CORPORATION AND GENERAL DYNAMICS CORPORATION, | Research & Development Contract; Termination for Default; Failure to Make Progress; Lisbon Test; Contract Completion |
| Plaintiffs, | Date; 48 C.F.R.§ 52.249-9; Termination Memo; |
| v. | Application of DeVito Test; Waiver of Delivery Date; |
| UNITED STATES OF AMERICA, | Unilateral Contract Modification; Reasonable and Enforceable |
| Defendant. | Schedule; Lost Profits; Loss Ratio; Contracting Officer; Notice to |
| * * * * * * * * | Cure; Adequate Assurances. |

Caryl A. Potter, III, Sonnenschein Nath & Rosenthal LLP, Washington, D.C., for plaintiff McDonnell Douglas Corporation. Elizabeth A. Farrell, of counsel.

Linda L. Listrom, Jenner & Block LLP, Chicago, IL, for plaintiff General Dynamics Corporation. David A. Churchill, Donald B. Verilli, Jr., Jenner & Block LLP, Washington, D.C., of counsel.

Bryant G. Snee, Patricia M. McCarthy, Alan J. Lo Re, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Wendell A. Kjos, Mark A. Romano, Department of the Navy, of counsel.

## ORDER AND OPINION

HODGES, Judge.

The United States contracted with McDonnell Douglas and General Dynamics to design and build stealth aircraft for the Navy, then abruptly terminated the contractors for default. The contractors sued to convert the default to termination for convenience of the Government. The A-12 contract was technically complex, as might be expected of a major new weapons system, and the parties anticipated many years of development. The projected cost exceeded $4 billion

in the initial stages.  The purpose of the Full-Scale Engineering and Development (or FSED) contract was to design, develop, manufacture, and test eight A-12 aircraft.  The eighth plane would serve as a prototype for subsequent production aircraft.  Upon successful completion of the FSED effort, the Government could direct plaintiffs to begin a production phase.  A series of options authorized the A-12 production phase in the contract by which the Government could purchase production "Lots" of aircraft.  At termination, the Navy had exercised its contractual right to order six production aircraft, known as Lot I.

Almost from the beginning, the contractors encountered problems that caused them to fall behind schedule.  McDonnell Douglas and General Dynamics were to deliver the first test aircraft in June 1990.  It became apparent well before then that the contractors would not meet that schedule.  The first test aircraft was a key milestone in development of the A-12 known as first flight.  The parties were unable to agree on rescheduling first flight and the succeeding seven aircraft of the FSED phase.  The Navy extended the delivery dates unilaterally to accommodate the delayed prototypes.  This unilateral modification of the contract's schedule was designated P00046.  P00046 lies at the heart of this dispute.

The issue on remand is "whether the Government's default termination was justified." McDonnell Douglas Corp. v. United States, 323 F.3d 1006, 1014 (Fed. Cir. 2003).  FAR 52.249-9 describes the Government's authority to terminate a research and development contract for default.  That section authorizes the Government to terminate a contract if the contractor fails to "prosecute the work so as to endanger performance of th[e] contract."  FAR 52.249-9(a)(1)(ii).

We review defendant's default termination according to the "Lisbon standard." McDonnell Douglas, 323 F.3d at 1015; see Lisbon Contractors, Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987).  The Lisbon standard permits termination for default if the Government demonstrates that the contracting officer had a reasonable belief "'that there was no reasonable likelihood that the contractor[s] could perform the entire contract effort within the time remaining for contract performance.'"  McDonnell Douglas, 323 F.3d at 1016 (quoting Lisbon, 828 F.2d at 765).  The Court of Appeals for the Federal Circuit emphasized the importance of "decid[ing] the actual performance that the contract requires and the amount of time remaining for performance" before making that determination.  Id. at 1017 (citing Lisbon, 828 F.2d at 766).  In fact, the Circuit observed:

> Unless the contracting officer had determined the entire effort required under the contract and the time left to complete the contract, it would be difficult, if not impossible, for him to resolve whether there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance.

Id. (internal quotation marks and citation omitted).  The parties disagree about the meaning of the Circuit's remand directing the court to apply the Lisbon test in this research and development

contract.

The contractors urge the court to employ a strict interpretation of the Circuit's remand. That is, "the entire contract effort" must be all-inclusive, comprising the eight FSED aircraft, the six Lot I production aircraft and years of follow-on testing, aircraft maintenance, and contractor support for the Navy. Plaintiff McDonnell Douglas argues that no contracting officer could reasonably have terminated the A-12 contract for default for failure to make progress if he did not know the work left to be done and the time left to do it.

The Government offers a more flexible approach. The "entire contract effort" as used by the Circuit represents a convenient and enforceable yardstick this court can use to evaluate the contractors' progress at termination. Time was of the essence in the A-12 contract, and plaintiffs had an obligation to make enough progress to insure performance was not endangered. This court should decide whether the weight of the evidence in the record shows that the contracting officer was reasonably justified in feeling insecure about the contract's timely completion.

Defendant's argument is important in that the size of the yardstick does not matter. That is, the "entire contract effort" need not include every segment of work envisaged by the contract, but may be any objective measure of the contractors' progress at termination. Defendant's suggestion that we use a reasonable yardstick to measure performance is attractive for its flexibility and its simplicity, but it may be foreclosed by earlier rulings of the Federal Circuit.

The A-12 contract did not define "the time remaining for contract performance," as plaintiffs have interpreted that phrase. The contract has no "time remaining for contract performance" as in supply, service, and construction contracts. Defendant cannot prevail if the law requires an enforceable contract completion date at termination. That is, if the date we must look to in measuring the contractors' progress can occur no earlier than after completion of plaintiffs' contract requirements, we would vacate the termination for default. See Divecon Servs., LP v. Dep't of Commerce, GSBCA No. 15997, 04-2 BCA ¶ 32,656 (June 22, 2004) ("Without a . . . specific completion date, the Government could not rationally terminate for default for failure to make progress, since there was no objective against which the contractor's progress could be judged."). The contracting officer did not know in January 1991 when contract completion might occur.

Defendant's burden of proof does not necessarily require the Government to provide a completion date for the entire contract effort, however. The FAR default provision does not refer to contract completion. The Circuit emphasized the importance of that requirement repeatedly, but the court also suggested other factors for consideration. Comparison of the percentage of work completed with the time remaining is only one consideration. McDonnell Douglas, 323 F.3d at 1016-17. The time remaining for performance is part of the "objective inquiry" under Lisbon. Id. Defendant's inability to establish a completion date for the A-12 contract does not compel a ruling for plaintiffs.

3

The ruling in this case depends on a discrete element of contract performance used as a yardstick to measure the contractors' progress at termination. The Navy's unilateral modification known as P00046 serves this purpose. The schedule for P00046 contained benchmarks for performance and enforceable delivery dates when termination occurred in January 1991; it represents the "entire contract effort" the Circuit requires for measuring performance. This yardstick enables the court to consider the contractors' progress in light of factors that are probative of their ability and willingness to perform.

This Opinion also discusses "other factors usually relied on by courts and contract boards," for determining contractors' progress. Id. The contracting officer could have concluded that McDonnell Douglas and General Dynamics had "no reasonable likelihood" of delivering the aircraft on time as measured by the P00046 schedule. We must again uphold the Government's default termination of the A-12 contract.

# I. BACKGROUND

The Government began development of the A-12 Avenger in 1984. The agreement between the Navy and the contracting team of McDonnell Douglas and General Dynamics was an incrementally-funded, fixed-price full-scale engineering and development (FSED) contract. Its purpose was to design, manufacture, and test eight A-12 prototypes. The Navy would use the prototypes to test various aspects of the aircraft's design; it maintained options to order production aircraft later.

The contract schedule required plaintiffs to deliver the first prototype in June 1990. Seven additional prototypes were due monthly through January 1991. The Navy exercised its option to purchase Lot I of the production models in May 1990, before the contractors were to deliver the first prototype. As it became clear the contractors would not make first flight in June 1990, the Navy issued a unilateral contract modification in August 1990, extending first flight to December 1991. Known as P00046, the modification extended the seven additional A-12 prototypes through February 1993.

The United States terminated plaintiffs' contract for default in January 1991, nearly a year before the first flight was due.

## A. THE A-12 CONTRACT

Plaintiffs' incentive contract had a target price of approximately $4.38 billion, and a ceiling price of $4.77 billion. The Government would pay forty percent of any costs over the contract price and below the ceiling price. The contractors would pay the remaining sixty percent, and all costs over the ceiling price.

The contract required the Navy to make payments in eleven installments from the date

the parties signed the contract to the last payment on November 1, 1992. The terms of the installment payments were contained in Clause H-7 of the contract, which stated,

(a) This financing arrangement is necessitated by the unavailability for obligation, at the outset of this contract, of sufficient funds to cover the total target values or ceiling price of the basic FSED contract line items.

(b) The Contractor agrees that the Government's obligation of funds in the amounts and by the dates set forth below will permit compliance with the contract. The Contractor acknowledges that the terms and conditions of the performance of this contract have been established on the basis that the Contractor's termination liability will not exceed the amount set forth below by the dates set forth opposite said amounts. Nothing herein shall authorize nor require the contractor to incur costs, plus a reasonable allowance of profit, in excess of the total amount obligated at any given time. . . .

(c) In the event the Government fails to obligate any specified installment by the time specified, the Contractor[]will continue performance of the contract only to the extent that he shall not be required to incur obligations (termination liability) beyond that amount already obligated by the Government. . . . The Government's total obligation for payment (including termination settlement expenses) under this contract shall not exceed the total amount obligated at the time of termination. . . .

(e) Nothing contained in this clause shall affect the right of the Government to terminate this contract pursuant to either the "Default" or "Termination for Convenience of the Government" clauses.

The A-12 Program encompassed contract phases such as Concept Formulation, Full-Scale Development, Demonstration/Validation, and Full Rate Production. The Navy obtained approval from the Defense Acquisition Board, or DAB, at each development phase. The Navy agreed to proceed with Full-Scale Development (FSED) after the Defense Acquisition Board approved the Demonstration/Validation phase in January 1988.

The contract required plaintiffs to design, build, and test eight A-12 prototypes, manage the work according to the contract schedule, and provide logistical support to the Navy.[1] Section B of the contract consisted of a series of Contract Line Item Numbers, or CLINs. Each was tied to a particular aspect of work. For example, CLIN 0001 was the ATA Aircraft Initial Design

---

[1] The Navy's solicitation stated: "The intent of the Navy is to procure under one contract, the design, fabrication, test, and evaluation efforts necessary to qualify the ATA Full Scale Development (FSED) aircraft for production."

Review (IDR).  The contract contained fifty-six CLINs, numbered 0001 through 0058, at a total cost of $4,379,219,436.  Lot I production CLINs ranged from 0101 through 0133.  Four CLINs were deleted eventually from the contract's requirements.[2]

Section C of the A-12 contract contained the Work Statement.  The CLINs in section C were divided among five areas of performance: design, manufacturing, testing, support, and management.

### 1. Design

The design phase called for a series of performance reviews to ensure that the A-12 design was progressing according to contract requirements.  CLIN 0001 was Initial Design Review.  This review assessed whether "the selected aircraft design approach [wa]s compatible with the engineering requirements of the contract."  It was "a means of determining that the contractor[s] ha[d] correctly understood all aircraft design and test requirements."

CLIN 0002 was the Preliminary Design Review, which "evaluate[d] the progress, technical adequacy, and risk allocation (on technical, cost, and schedule bases) of the selected design approach and determine[d] its compatibility with performance and engineering requirements of the development specification."  The contract stated that "completion and approval . . . of the final [Preliminary Design Review] w[ould] result in authorization for the contractor[s] to proceed with the design of the [aircraft]."

CLIN 0003 was Critical Design Review (CDR).  CDR would occur "when detail design and analysis [wa]s essentially complete (90%)."  This review sought to examine "the potential of the detailed design of the [aircraft] to satisfy the performance and engineering requirements of the [aircraft's] development specifications."  Review at this level would take place over a number of sessions "consistent with the completion schedule for the individual design efforts."  CLIN 0004 added, "[a]t the conclusion of the incremental CDRs a final CDR of approximately four working days will be held to summarize the results of the individual CDRs.  The review program would be closed upon approval by the Navy of the final CDR.  This would "result in authorization for the Contractor[s] to proceed with the design of the ATA aircraft."  After approval of the design, the contractors would move on to manufacture.

---

[2] The Navy could have moved to the Full Rate Production phase if the contractors had built the eight prototypes.  Therefore, Section B of the A-12 contract contained CLINs for the production options of the contract.  Option Item 0101 was the six production aircraft in Production Option I, or Lot I.  Lot I accounted for thirty-one additional CLINs.  Option Item 0201 corresponded to eight production aircraft authorized by Production Option II, which contained thirty-two CLINs.  Similar procedures applied to Options through Lot VI.

### 2.  Manufacturing

The contractors began the process of manufacturing the first prototypes after the Navy approved their design.  The contract called for the "manufacture and furnish[ing of] eight (8) aircraft and associated mockups, models, and test articles in accordance with the Detail Specification for ATA Weapon System, SD-574-1."[3]  Plaintiffs would develop Avionics Integration Laboratories "as needed to provide a technically acceptable product within schedule."

The eight FSED prototypes would undergo careful ground and flight testing of nearly every aspect of the A-12's design.  Each test aircraft would be more complex than the last.  The ground testing requirements were set forth in an addendum to the contract, attachments 12-18.  These were the "Contract Engineering and Test Requirements for the Advanced Tactical Aircraft Weapon System."  Flight testing would evaluate the aircraft's propulsion systems and its ability to take off and land from carriers at sea.  These and other technical aspects, would be monitored from first flight through completion of TECHEVAL.  Attachments 18-22 of the contract contain detailed descriptions of these flight tests.

The testing phase was sequential, in that later tests were dependent upon successful completion of earlier testing efforts.  Rigorous testing procedures did not end with the eight prototypes.  Production aircraft produced in Lot I would be used to test various aspects of the plane's performance as well.

CLINs 0051 through 0056 were tied to Phases I through VI of the contractors' testing responsibilities.  Testing Phase VI overlapped with TECHEVAL,[4] the Navy's formal testing and evaluation program for the A-12.  The purpose of TECHEVAL was to assure that the aircraft met technical requirements of the contract.

### 3.  Testing

The A-12 contract provided that the Navy would monitor the contractors' progress during all phases of contract performance.  CLIN 0005 stated that satisfactory completion of interim requirements would not occur until the Government approved the results of tests, inspections, or analyses of such requirements.  This line item established joint Navy-contractor aircraft conferences and reviews.  These conferences included the First Flight Readiness Review and the

---

[3] SD-574-1 is the "detailed Specification for Carrier Based Advanced Tactical Aircraft Weapon System."  It outlines the A-12's technical specifications, which are contained in Attachments 2-11 in Section J of the contract.

[4] CLIN 0056 required the contractors to "conduct Phase VI of testing . . . as required to the completion of TECHEVAL on all TECHEVAL aircraft."

Production Readiness Review.  Contract line items related to maintenance, support, and management programs were 0021, 0024, 0035, 0037, and 0049.[5]

The most important requirement of the contract for our purposes is schedule.  Schedule is the reason the contracting officer gave for default terminating the contractors; it is the remaining basis for evaluating the contractors performance.

4.  Schedule

The delivery schedules are in Section F of the A-12 contract.  Performance deadlines could be derived either from the Master Program Schedule, by referring to other CLINs in the contract, or from assigned calendar dates.  For example, the final FSED aircraft was due initially in January 1991, an assigned date.  Derived dates included Item 0001, Initial Design Review, due "[n]ot later than 6 months after contract award."  Item 0002, Preliminary Design Review was due "[n]ot later than 12 months after Contract Award."  Item 003, Critical Design Review, would occur "18 Months after Contract Award."[6]

The eight FSED aircraft provided for in Line Item 0005 were to be delivered on a schedule of approximately one per month beginning in June 1990.  The final FSED aircraft would be delivered in January 1991, according to the original schedule.  The FSED contract schedule originated from CLIN 0011, which stated,

_____

[5] Section E of the A-12 contract dealt with inspection and acceptance of the work by the Navy.  With respect to FSED requirements, the contract stated,

Initial Design Review (IDR) under Item 0001, Preliminary Design Review (PDR) under Item 0002 and Critical Design Review (CDR) under Item 0003 are not complete until these reviews on the entire aircraft have been completed and approved by NAVAIR (AIR-05), all action items have been closed (defined, with mutually acceptable resolution plans which specify a schedule and the party who has the action), and under CDR (Item 0003) the Lot IV proposal in accordance with clause H-22 has been received.  Provisional acceptance of the first aircraft under Item 0005 will evidence completion of Item 0006. . . .

[6] The Navy awarded the A-12 contract on January 13, 1988.  Tying the dates in Section F to the award date meant IDR would take place no later than June 13, 1988; PDR was due by January 13, 1989, and CDR would begin June 13, 1989.  Section F stated that "Critical Design Review (CDR) is not complete until CDR on the entire aircraft has been completed, all action items have been closed (defined with mutually acceptable resolution plans which specify a schedule and the party who has the action), and the Lot IV proposal in accordance with clause H-22 has been received."

8

[t]he Contractor shall establish and maintain management activities in accordance with the Project Management Requirements for the ATA Aircraft Weapon system to satisfactorily complete the tasks required by this contract. The program management effort shall be established with authority delegated at appropriate levels. Individual assignments within the management organization shall facilitate single-points-of-contact for interface with Government Managers in a timely manner. The Contractor shall commit such resources as are necessary to accomplish the requirements stated herein. Program Management shall be accomplished in accordance with Attachment 24, the Program Management Requirements of the ATA Aircraft Weapon System, . . . and Attachment 25.

The A-12 contract required plaintiffs to prepare a Master Schedule to "include all critical activities necessary to complete the work required by the contract" and the important Navy milestones defined in Attachment 25. Upon approval by the Government, the Master Program Schedule would be the "baseline schedule against which progress will be measured." Plaintiffs provided the Master Program Schedule in their Best and Final Offer, and updated the Master Schedule periodically. Their last update prior to contract termination was August 20, 1990.[7]

---

[7] Attachment 24 to the Contract included the following:

2.2 <u>Master Program Schedule</u>. The Contractor shall prepare a Master Schedule for the ATA Project. This schedule shall include all critical activities necessary to complete the work required by the contract. Critical paths shall be highlighted and sensitivity to changes in schedule or resource availability identified. Required government activities shall be included in the schedule, and any critical actions identified. Following joint Program Office and Contractor review and concurrence, this schedule shall become the Master Program Schedule, and will become the baseline schedule against which project progress will be measured.

Attachment 25 identified the following critical milestones:

| Milestone | Date |
| --- | --- |
| FSED Start | December 1987 |
| First Flight | June 1990 |
| TECHEVAL | April 1993 |
| OPEVAL | June 1993 - November 1993 |
| BIS Trial | June 1994 |
| O Level | July 1994 |
| IOC | July 1994 |

5.  Other Contract Provisions

The A-12 contract contained clauses from Federal Acquisition Regulations that routinely appear in fixed-price contracts such as this.  The following provisions were incorporated by reference from FAR and applied to the FSED contract, CLINs 0001 to 0058:

FAR 52.232-2        Payments (Fixed-Price Research and Development);
FAR 52.232-16      Progress Payments;
FAR 52.232-17      Interest;
FAR 52.243-1        Changes – Fixed-Price;
FAR 52.249-2        Termination for Convenience of the Government; and
FAR 52.249-9        Default (Fixed-Price Research and Development).

Standard provisions for the production options were separate from the FSED portion of the contract.  Most were the same, but the termination clause was an important exception.  The contract for production lots incorporated FAR default provisions for Fixed-Price Supply and Service contracts.

The parties agree that plaintiffs were to design, construct, and test the A-12, support the Navy in its tests of the aircraft, and manage work according to the contract schedule.  They were to perform the work in a sequential fashion, so the projects would build on each other.  The design phase came first, followed by production, then testing.  The parties disagree about practically everything else.[8]

The Naval Air Command, referred to as NAVAIR, awarded the A-12 contract to General Dynamics and McDonnell Douglas on January 13, 1988.  The contractors began work immediately.

B.  CONTRACTORS' PERFORMANCE

Performance of the FSED contract on schedule was more difficult than expected for a number of reasons.  No one had developed a stealth fighter with the A-12's flight capabilities. The science and technology required was state-of-the-art. The United States Air Force chose not to share its highly sensitive stealth information sufficiently to avoid technical difficulties and

---

Support                  March 1996

[8] The appeals court made reference to reopening the record, leaving that matter to the trial court's discretion.  The parties agree that this court has all the information necessary to rule on the issues at hand.  See infra note 54.

delay.[9]  The Air Force eventually made much of the needed information available but it was too late in the process, according to the contractors.  The plaintiffs' progress in key areas of performance prior to termination are summarized in the following sections.

## 1.  Design

The Navy conducted design reviews to assess plaintiffs' progress on the A-12 design. Critical Design Review was among the last steps in this process.  Admiral John Lockard was responsible for overseeing the design reviews.  He testified that Critical Design Review would "provide a sense of [whether] the requirement [would] be satisfied by the product in its detailed design state, [then] ensure that the product is producible; in other words, that [the contractors] could build them in a repetitive way such that . . . one airplane looks like the next airplane."

The CDR process offered the Navy an opportunity to raise lingering concerns about technical progress through Requests for Action, or RFAs.  The Navy made 433 such requests. By the close of CDR, Admiral Lockard had signed all 433 Requests for Action.  Admiral Lockard stated at trial that "[e]ach [RFA] had been signed by me, indicating that as far as I was concerned, I had reached agreement with the contractor."  His signature provided evidence that the parties had resolved issues represented by Requests for Action.

Admiral Lockard closed the formal Design Review Board activity on October 22, 1990, and stated "[a] fair agreement has been reached, one which will provide the Navy with the product they need."  He added, "[t]echnical resolution on the airplane" was accomplished as well.  Admiral Lockard thought the Navy and the contractors were "in the process to a satisfactory conclusion of CDR."  He wrote that the "product as defined [in the CDR activity] will meet [the Navy's] operational requirements."

At the same time, Admiral Lockard reported to Navy Secretary Gerald Cann a "lingering technical concern" on some design and production aspects.  Admiral Lockard noted in particular that

---

[9] Compartmented "state secrets" normally belong to and are controlled by government agencies rather than "the Government."  Rules for handling so-called Black Programs vary among the agencies.  This tends to cause friction – in this case, between the Navy and the Air Force.  As one example, the agencies' rules defining "need to know" are entirely different. The contractors wanted and needed highly sensitive technical information for the A-12, and the Navy wanted them to have it.  This created many legal and logistical problems unrelated to the merits, and required substantial and frequent court involvement.  Security personnel assigned to this court, our office of the Clerk of Court, and professionals attached to the Department of Justice, provided advice and assistance.

the tooling concept that was being used to build these very complex parts was one which there was much debate about.  [C]ould that [concept] really produce[?]  Until we could get some consistency, it was hard . . . to make a determination that, in fact, they could do this repeatedly at a production rate sufficient to produce parts to support a production line of so many per month.[10]

During the Count XVII trial, Admiral Lockard described the contractors' difficulty in manufacturing the major structural components of the aircraft, termed "big bones."  He explained that it was the first time anyone had built a structure of this size, with the materials being used.  The "big bones" were

critical to the design – to the integrity of the airplane, and [the contractors] were not making progress in building these.  As a matter of fact, they were severely behind and going further behind in building these parts, and we couldn't assemble the first airplane until they were able to build these parts successfully.

These were concerns expressed about the Admiral's findings at CDR.  As termination approached, Admiral Lockard testified about

almost daily meetings between Admiral Morris and myself, trying to figure out how we were going to be able to resolve this and keep this program on track.  So we discussed all of the technical issues, could we get them resolved, if we could find a way to satisfy the business arrangements, to get the contractors to do the work, and we were certain that we could do it.  We were unsuccessful in my discussions, though, at that point of finding a way to get the contractors to do the work.

When asked his assessment of the contractors' ability to manufacture composite parts at termination, Admiral Lockard responded,

there was still an awful lot of uncertainty in the ability, particularly for General Dynamics.  The tooling concept that they had chosen, I was very concerned that

---

[10] Admiral Lockard's message to Secretary Cann was intended to convey the Navy's "need[] to ensure that [it] worked with the contractor to improve their ability to get yield from the parts in a predictable way, and if we didn't do that, then [the Navy and the contractors] weren't ready for production."  Asked why production would not occur on time, Admiral Lockard responded, "[b]ecause you couldn't predict how much the airplanes were going to cost if you didn't know how long it was going to take to get the number of parts required to build it."

it was going to be able to produce parts in a repeatable fashion. They had not been able to stabilize it. I thought it was critical in nature, and I was concerned that it was going to take us more time to work that tooling concept out in order to have one that could produce with certainty parts that could be used on a continuing basis.

However, Admiral Lockard closed the formal Defense Review Boards because the technical problems had been resolved. He stated at adjournment that "[a] fair agreement has been reached, one which will provide the Navy with the product they need." The Admiral concluded, "technical resolution of the airplane has been reached."

The contractors worked on the Program during and after the design reviews. Technical agreements between plaintiffs and the Navy caused the contractors to modify their work in some cases, often changing the agreements from original contract requirements. Officials from General Dynamics and McDonnell Douglas understood that the contract work should continue according to the agreements reached at CDR. When CDR closed, the parties had negotiated a critical path toward completion of the design and development of the aircraft.

Mr. Lamers of General Dynamics made the following announcement at an "all hands meeting" in November 1990:

The critical design review is completed, this is the end of the . . . three major reviews that have been taking place over the last more than two years. Thirty-eight significant issues were resolved. We've closed 433 requests for action. . . . [a]nd it does constitute the Navy's formal approval [and] ratification of the design of the A-12.[11]

The Navy knew months prior to the final Critical Design Review that the A-12 would not meet some of the technical specifications in the contract. Despite such knowledge, the Navy agreed that technical concerns had been addressed and resolved to its satisfaction. The Navy accepted plaintiffs' design for the A-12 in November 1990.[12]  The next issue was whether the

---

[11] The Government accepted plaintiffs' design just over a month before its decision to terminate plaintiffs for default for failure to make progress.

[12] The Government contends that the court may not use the agreements reached at CDR as waiver of nonconformance by the Government because such agreements were not signed formally. The contractors maintain that the parties considered themselves bound by the agreements at that time, despite the lack of formal signatures. The issue is not whether the agreements are legally binding documents in any event. The agreements provide additional evidence that the Government had accepted plaintiffs' design. Moreover, government officials commented at trial that these "handshake agreements" had the weight of

contractors could manufacture the plane according to the designers' intent.

## 2. Manufacturing

The contract required plaintiffs to "design, develop, manufacture and furnish eight (8) Full Scale Engineering Development (FSED) aircraft and associated mockups, models, and test articles in accordance with the Detail Specification for [the Advanced Tactical Aircraft] Weapon System . . . ." The contractors would employ a "building block" approach, building each succeeding prototype to be significantly more complex than the previous one. The first prototype would test the A-12's ability to fly. Once the Navy and the contractors knew the first aircraft would get off the ground, the contractors would address other capabilities of the plane in subsequent prototypes. For example, the second prototype would test the propulsion system. Other FSED aircraft would examine the A-12's avionics and carrier suitability. See, e.g., McDonnell Douglas Corp. v. United States, 35 Fed. Cl. 358, 362 (1996). ("Each FSED aircraft would test different characteristics of the A-12; stealth capabilities would be verified in the 'fully capable, fully equipped' eighth aircraft that would serve as the basis for the production lots.").

The companies monitored the A-12's manufacturing schedule carefully. Mr. A.L. Briggs was the Vice President of McDonnell Douglas for Manufacturing Operations. His December 12, 1990 report assessed the A-12's manufacturing performance, the study of which he began in March 1990.

Briggs' March investigation "revealed serious differences between the program status reports and the actual conditions on the shop floor and in the tooling and detail parts fabrication." While status reports were showing first flight in December 1990, his assessment was that first flight would be at least "four to six months later" than stated. He reassessed the program again in June and found "no improvement." In fact, he believed "the program had worsened somewhat." Such assessments were grim, but McDonnell Douglas received more favorable commentary:

> The Technology exists and McAir Manufacturing has the ability to build the A-12 aircraft as designed. Fabrication, Assembly and Tooling are all geared up and focused on the job at hand. By creating a realistic schedule and managing to that schedule, McAir Manufacturing can deliver the major assemblies to Tulsa in accordance with the revised plan.

The report on General Dynamics was ominous. Mr. Briggs said, "GD engineers designed

---

contractual force, and everyone intended to honor them. The Navy's relationship with plaintiffs was a solid and impressive one throughout. They worked together closely and both sides handled day-to-day affairs of the relationship honorably.

an airplane that GD Manufacturing could not build." He explained, "[t]he complexity of the composite parts was far beyond manufacturing's available technology in tooling and part fabrication." If Admiral Morris had been aware of this evaluation, it would have given him reason to be concerned about timely completion.[13] By December, however, Briggs had concluded that the "[m]anufacturing team is capable of building the A-12 aircraft as it is now defined. . . . The revised schedule for getting the major assemblies to Tulsa and the activity at Tulsa are energetic, but achievable."

Mr. Briggs compiled a year-end appraisal of the A-12 schedule position in December 1990, discussing the progress of "McAir, GDFW, and Tulsa" in meeting the contract's revised schedule.[14] He concluded that the "Tulsa effort . . . [wa]s progressing on plan." In St. Louis, the forward fuselage was "[p]rogressing satisfactorily," as was the aft fuselage, despite delays resulting from the Navy's rejection of certain parts. Work on the R/H Outer Wing "suffered severe set backs due to recently identified engineering changes" but the delivery date for the parts was "still achievable."

The report also discussed General Dynamics' offload issues. The "[t]ooling and parts fabrication are progressing [but] [a]pproximately 20 critical parts are being tracked by the Navy as potential show stoppers." The center fuselage was "[p]rogressing satisfactorily" to meet delivery dates, and the L/H Outer Wing was experiencing the same problems as the right outer wing. The Inner Wing assembly, however, was "in worse condition" than when the delivery schedule was established. The report indicated that there was "[n]o known resolution at th[e] time."

The delivery date was August 1991. Briggs felt the date was still achievable, but he was "losing confidence." He detected a "serious deterioration of the wing condition in the last few days." Under existing conditions, General Dynamics "probably will not be able to build the Inner Wing assemblies on or near schedule." He identified possible solutions for the situation, including integration of a joint assembly team.

Mr. Briggs concluded the report as follows:

I believe the March 1992 First Flight date is still achievable, but only after

---

[13] It may not matter whether Admiral Morris knew about such reports. The Federal Circuit ruled that so long as the information was available to the Government, the court may consider it in reviewing the contracting officer's decision. See, e.g., Empire Energy Mgmt. Sys., Inc. v. Roche, 362 F.3d 1343, 1357 (Fed. Cir. 2004).

[14] McAir, General Dynamics Fort Worth (or GDFW), and Tulsa are references to the contractors' manufacturing centers. McAir was a division of McDonnell Douglas located in St. Louis, Missouri.

significant changes which I intend to pursue immediately after the reorganization.[15]  My confidence in the March 1992 flight date is reduced to approximately 50% based on current conditions.

Mr. Dave Cormany of General Dynamics highlighted manufacturing problems in an interoffice memorandum sent December 14, 1990.  He expressed this dissatisfaction:

> In walking through and actually touching the two surviving [aircraft] parts this morning, I am convinced that if either makes it, it will not be near term. Therefore, we must assume that, as of today, we have NO coverage for ships 1-3 for this part.
> . . .
> I was very, very dissatisfied with the lack of control we had in inspection/support areas I visited today.  We either had people sitting around with no work in areas we are calling critical, or we had parts languishing in areas they had no business being, with no drive to work them or move them.  Both are unsatisfactory.
>
> I believe we can produce one piece of any rib part number each eight to nine days, if we really want to.  If we want an A-12 program, we had best want to do so with all our hearts.  SOUND "BATTLE STATIONS"!  We are in desperate trouble.

Mr. Cormany sent a second memorandum on December 28, 1990:

> Perhaps there is some misunderstanding regarding the urgency on the subject LH rib for SWBS 3810.  This rib started layup approximately 19 December.  It is still not complete.  Since 26 December, I have personally visited the part of each shift day during the holiday and have been told daily there are no problems and that the part should go to cure "next shift."  It still sits exactly as it did on that date.
>
> Folks, we have NO PARTS for any aircraft of this part number.  We are in a program day-for day side until the part reaches stock.  We are currently breaching the drop-dead commitment date for the program of 31 March 1992, due to this part.  I just do not understand how we can let the program critical parts sit for days and days.  I am now very concerned with total out time accumulation for the part, in light of its extended layup period, and the upcoming week-end and holiday.

---

[15] The phrase, "immediately after the reorganization" highlights the importance that both the Navy and the contractors placed on restructuring the contract.

PLEASE get someone working on this job, and get it done! . . .

Plaintiffs' own technicians were not happy with the manufacturing process.  The Navy seemed at least acquiescent prior to Pentagon intervention in December 1990, if concerned about the pace.

### 3.  Testing

Ground testing was underway in December; flight testing would have begun with first flight.  The Government terminated the A-12 contract for default nearly a year before first flight.  Admiral Lockard described his frustration in November 1990:

[No one could] predict with accuracy when we were going to fly the plane until we had, in fact, successfully built the parts for the first one.  Because we were having difficulty building those parts, I could not come to a determination of when we would actually – with some level of certainty – fly the first airplane.

Admiral Lockard had expressed this concern at a Design Review Briefing in November 1990.  He added, "[b]usiness factors still cloud [the] technical picture."

### 4.  Business Issues

Work on the A-12 contract progressed over budget during the early stages of contract performance.  Ms. Eleanor Spector, Deputy Assistant Secretary of Defense for Procurement, testified that "the contractor was spending at a rate of 120 million to 150 million per month."  Admiral Morris stated that the contractors' "rate of investment on a monthly basis" was around $150 million.

Ms. Spector[16] explained how financial problems could affect contract performance:

[W]hat generally happens when a contractor has financial problems is it's unable to do work-arounds.  It's unable to do new technical approaches that may be necessary to solve a problem.  That's particularly true in these fixed price development contracts where the whole contract is for development, and you have to keep trying different things if the first thing doesn't work.  So when you're

---

[16] Eleanor Spector's testimony was valuable.  Documents produced in discovery showed that she had insight approaching prescience.  For example, she opposed putting the A-12 out for bids on a fixed-price contract.  She relented only with assurance that the Government would share its stealth technology with the contractors.  Otherwise, she predicted, it cannot be done.

having financial difficulties, it becomes difficult to do new design approaches, necessary fixes to problems that inevitably arise.

Plaintiffs asserted that performing to the specifications on a fixed-price contract was impossible.[17] They wanted to modify the contract terms due to impossibility of performance and nondisclosure of superior knowledge regarding stealth technology. Secretary of the Navy Lawrence Garrett asked plaintiffs' CEOs in a June 20 letter to provide detailed descriptions of the contractors' proposed options for proceeding with the A-12 Program. The contractors stated that the fundamental problem with the contract was its fixed-price structure. They proposed modifications but could not reach an agreement with the Navy.

Plaintiffs warned the Navy in September 1990 that insufficient funds were obligated to the FSED portion of the contract. They asked that funding be provided at a more rapid rate "to preclude the possibility that the contractors may have to stop work under the contract." The Navy refused this request on October 3, and a similar request by the contractors in November, but obligated a scheduled $185 million installment to the contract on November 1, 1990.

## C. SCHEDULE

Schedule problems have been an issue of paramount importance in the history of this case. They caused the Government to waive the requirement for first flight in June 1990, creating a <u>DeVito</u> waiver issue that is crucial to plaintiffs' case. <u>See</u> <u>DeVito v. United States</u>, 413 F.2d 1147 (Ct. Cl. 1969). Schedule problems caused the Navy to issue P00046, which overlapped the original contract schedule for Lot I and created a "nonsensical" situation. The P00046 schedule serves as the court's standard for measuring plaintiffs' performance.

The Federal Circuit ruled that the trial court should determine whether plaintiffs were in default at termination. We focused on schedule because other reasons that Admiral Morris gave for terminating the contract were not valid. <u>See</u> <u>McDonnell Douglas</u>, 323 F.3d at 1011; <u>McDonnell Douglas Corp. v. United States</u>, 50 Fed. Cl. 311, 319-24 (2001). Schedule again appears to be a key to resolving this case. The issue is whether the Government's termination for default is justifiable. Schedule is one basis for deciding reasonableness of the Government default decision. To know whether the termination was reasonable, we must know the amount of time remaining on the contract, according to the Federal Circuit. <u>McDonnell Douglas</u>, 323 F.3d at 1017.

---

[17] Donald J. Yockey, Acting Under Secretary of Defense (Acquisition), apparently agreed. Prior to termination, he lamented, "[w]hy did we ever go out on a fixed price contract? We should have learned long ago that you can't develop complex systems to a fixed price."

1.  First Flight

The A-12 contract included four options that permitted the Navy to order production aircraft delivered through 1995.  The Lot I option was executed by the Navy on May 30, 1990, requiring plaintiffs to manufacture six A-12 production aircraft in addition to the FSED prototypes.  This meant the contractors would deliver fourteen aircraft on dates certain through May 1992.  The contract contained the following schedule for delivery of prototype and optional production aircraft:

|  | Aircraft Number | Delivery Date |
|---|---|---|
| | 1 | June 1990 |
| | 2 | July 1990 |
| | 3 | August 1990 |
| | 4 | September 1990 |
| FSED | 5 | October 1990 |
| | 6 | November 1990 |
| | 7 | December 1990 |
| | 8 | January 1991 |
| | 9 | June 1991 |
| | 10 | August 1991 |
| | 11 | October 1991 |
| LOT I | 12 | December 1991 |
| | 13 | March 1992 |
| | 14 | May 1992 |

The contractors did not achieve first flight in June 1990.  The Navy took no steps to terminate the contract.[18]  However, the contracting officer at the time sent a letter to the contractors in July stating that they had not delivered the first aircraft in June as required by the contract and warned of the consequences of failure.[19]  Negotiations for rescheduling the contract

_____

[18] The Navy knew in Spring 1990 that the contract schedule would have to be restructured.  Plaintiffs asked Captain Elberfeld, the Navy's A-12 Program Manager at the time, "[w]hen the first flight date was missed, what did you do about it?"  He responded, "we all knew very well for many months before that it was not going to be achieved.  I don't recall taking any specific action immediately after it passed."

[19] Contracting Officer Mutty sent a letter to the Team on July 12.  He expressed "serious concern regarding [their] performance under the A-12 contract."  They had "failed to deliver the first aircraft as required by the contract . . . [and that] failure could jeopardize

19

ensued.

The contractors' CEOs were John McDonnell and Stanley Pace.  They presented a review of the A-12 Program to Navy officials on June 13, 1990.  The major discussion points were Technical Issues, Schedule, and Cost Status.  The report stated that weight of the aircraft was the top concern, but appeared to be "under control."   The CEOs reported "No Major 'Showstoppers'" on technical issues.  Schedule was next.

Management predicted first flight in the July 1992 through September 1992 period.  The remainder of the FSED schedule would be twelve to fourteen months beyond the original plan. Cost estimates at completion were "still in work, [with] a large variance between estimates," according to the CEOs.  They acknowledged that significant challenges remained, but announced that the Program was under control.  They discussed conclusions and recommendations at the high-level meeting, using slides with the following captions:

CONCLUSIONS

•    System Performance is Good With Excellent Overall Operational Capability
•    The Predicted Cost of the FSED Program Will Exceed the Ceiling by a Magnitude That the Companies Cannot Absorb
•    The Production Lot Option Not to Exceed Prices Are Also Predicted to Exceed Those Specified in the Contract
•    Current Schedule Does Not Match Contract Schedule
•    Production Lot III Would Be Exercised Prior to Sufficient Testing to Demonstrate System Performance
•    The Concurrence of the Program Will Likely Lead to Milestone IIIB Not Being Met

---

performance of the entire FSED effort."  He continued,

> [n]either your letter nor afterward have you provided any basis on which I could conclude that any of your obligations under the contract should be excused.  The little information you have provided is far from adequate to permit an assessment of the state of your performance under the contract.

Mutty directed the contractors to inform the Navy when they would deliver first flight, their plan to meet the remaining FSED schedule, and their consideration for proposed contract modifications.  He concluded with the following remarks: "[T]he Navy believes the contract is valid and enforceable on its terms.  The Navy is not waiving any of its rights under the contract by affording you the opportunity to respond with detailed information."

20

RECOMMENDATIONS

•     The Program Teams, Government and Industry, Have Been Studying Various
      Approaches to a Restructured Program
•     We Should Be Authorized to Complete this Study and Propose a Program and
      Business Arrangement That Is in the Best Interest of the A-12 Program,
      including:

      –     Deliveries Per Rephased Schedule for FSED and Lots 1, 2, 3 & 4
      –     Adjusted Specification
      –     Navy Added Requirements
      –     Contractor Claims

2.  P00046

Mr. Lamers of General Dynamics was the principal program manager for the contractors. He predicted they could deliver first flight in July 1991. The Government undertook an assessment of whether this goal was obtainable. See McDonnell Douglas, 50 Fed. Cl. at 317 (noting "[t]he Navy wanted a reasonable schedule, not an unachievable one. The contractors and the Navy convened a strategy board to put together a realistic schedule for first flight."). The contractors were working to an aggressive schedule, but they would not sign up for one. They did not want to become contractually bound to a new schedule because of the uncertainties of controlling weight without having the benefit of shared technical information from the Air Force. Captain Elberfeld developed a plan to restructure the A-12 contract through the Defense Acquisition Board. He testified that the DAB would serve to

get the program officially rebaselined. It would be the formal approval step necessary to get the program back into something that was manageable and controllable, in the sense of having the program documentation, the contract schedules, the financial and business arrangements and so on, all in place so that cost, schedule, and technical aspects of the program could be managed more efficiently, instead of working to a contract that had milestones that had already been missed . . .

Elberfeld's plan included a "path to the A-12 DAB." He issued P00046 as a step along this path – a modified unilateral FSED delivery schedule for aircrafts one through eight.[20] According to

---

[20] Captain Elberfeld testified that he was the person responsible for issuing P00046 to replace the bilateral schedule in the original contract. He approached his duty in a methodical and conscientious manner, and his schedule was reasonable. McDonnell

Captain Elberfeld's plan, the parties would resolve the technical issues at CDR and the Navy would present the revised technical baseline to the DAB for a decision.

The Navy issued P00046 on August 17, 1990. The modification moved the due dates for the FSED prototypes back about eighteen months; the revised schedule called for first flight in December 1991. The modification spread the remaining prototypes out as well, doubling the time for delivery between each aircraft. Instead of one per month, P00046 required delivery of one prototype approximately every two months. Aircrafts two through eight were due February, June, August, September, November, and December 1992, and February 1993.

P00046 revised FSED aircraft delivery dates but left Lot I and later milestones intact. Captain Elberfeld testified that after he issued the contract schedule modification, the Navy had "no schedule for the Lot I aircraft that you would call a realistic schedule." This fact was generally accepted among Navy officials familiar with the Program. The contractors could not have delivered Lot I aircraft on the dates the parties originally intended because of an overlap.[21]

---

Douglas, 50 Fed. Cl. at 316-19. The Navy did not waive the new schedule by announcing other acceptable dates for first flight. Id. at 319. The Federal Circuit affirmed these 2001 conclusions. McDonnell Douglas, 323 F.3d at 1018-20.

[21] The following chart shows that the schedule in place required plaintiffs to show that the first prototypes could fly before or at the same time they were to deliver fully-compliant production aircraft to the Navy:

| Aircraft Number | Delivery Date | Aircraft Number | Delivery Date |
|---|---|---|---|
| **ORIGINAL  FSED** | | **P00046** | |
| 1 | June 1990 | | |
| 2 | July 1990 | | |
| 3 | August 1990 | | |
| 4 | September 1990 | | |
| 5 | October 1990 | | |
| 6 | November 1990 | | |
| 7 | December 1990 | | |
| 8 | January 1991 | | |
| **LOT I** | | | |
| 9 | June 1991 | | |
| 10 | August 1991 | | |
| 11 | October 1991 | | |
| 12 | December 1991 | 1 | December 1991 |
| 13 | March 1992 | 2 | February 1992 |
| 14 | May 1992 | 3 | June 1992 |
| | | 4 | August 1992 |

22

Captain Elberfeld testified that the purpose of the unilateral modification was to serve as "a first step in achieving [the] overall delivery schedule . . . ."  The lack of new delivery schedules for Lot I "was not meant to imply that there was any intent or any thought that those aircraft could . . . be delivered earlier than the FSED aircraft."[22]

The ultimate contract completion date sought by the remand order would be a moving target, if it exists at all.  See McDonnell Douglas, 323 F.3d at 1017 (stating the Government must put forth "'direct evidence on the time which it estimated it would take [the contractor] to complete the contract'") (quoting Lisbon, 828 F.2d at 766).  In fact, if contract completion as envisioned by the Circuit should be a definite date by which plaintiffs were to complete entire contract performance, this contract did not provide such a date.  Captain Elberfeld explained the expectations of performance with a research and development contract:

> The schedule for – completing contracts is something that takes sometimes years.  Some contracts . . . [take] ten, fifteen years before they're closed out, even after the last aircraft is delivered. . . .  I don't know what the schedule is to close out the contract.  We had a schedule for delivering aircraft, we had a schedule for other milestones, like critical design review, preliminary design review, other major program milestones.  But I don't recall the contract saying . . . [it] will be completed and closed out on this date, as one of the requirements of the contract.

Captain Elberfeld's recollection was correct; the contract did not provide a close-out or completion date.  Later he observed, with a research and development contract, "[u]ntil you get to the end, you don't know what the last step is."[23]

_____

| 5 | September 1992 |
| 6 | November 1992 |
| 7 | December 1992 |
| 8 | February 1993 |

[22] Additional testimony from this witness confirms that it was "no one's idea to [deliver aircraft nine before aircraft one]."  We had the impression during trial that the overlap was a clerical error or oversight.  This enabled the ruling that the unilateral schedule was reasonable and therefore enforceable.  See McDonnell Douglas, 50 Fed. Cl. at 318-19.  It appears likely that the parties did not consider Lot I then; it was an oversight.  They assumed the contract would be restructured before Lot I became an issue.

[23] Captain Elberfeld was asked what level of contractor performance signified completion of the contract; i.e., what was the final act.  Captain Elberfeld responded, "[i]t depended on what they were doing and what they were having problems accomplishing . . . .  Until you get to the end, you don't know what the last step is."  Captain Elberfeld testified

During the months leading to termination, the contractors' internal schedules were showing that first flight would not occur in December 1991. Their projections showed first flight delivery three months later, in March 1992. Navy officials testified that defendant could not predict when the contractors would deliver first flight.

## D.  EVENTS LEADING TO TERMINATION

The Pentagon took over management of the A-12 Program in December 1990. Decisions regarding when and how to issue the notice to cure and other notices required by FAR originated from OSD. This development, along with the Government's need to obligate over one-half billion dollars to the A-12 program in January, marked the beginning of the end for the aircraft and for the contractors and their employees.

### 1.  Department of Defense

The Department of Defense initiated a Major Aircraft Review during 1990 to investigate pending weapons systems. Its purpose was to determine whether proposed new aircraft were needed in the post-Cold War environment. The A-12 Avenger fell under that review.

The Secretary of Defense visited the McDonnell Douglas plant in March 1990, as part of the government evaluation of national defense needs in response to changing world situations and reduced national security threats. He learned of concerns about the Program, but remained confident the Navy and the contractors could deliver the aircraft. He expressed confidence in the A-12 Program, and he assured Congress that the Navy's need for the aircraft persisted. The Navy would continue pursuit of its development.

The Defense Secretary reported results of the Major Aircraft Review to Congress in April 1990.[24] His comments about the A-12 Program were reassuring. Secretary Cheney told the Committee that the A-12 was "one of our most urgent requirements." He testified about the Navy's need for the Program and its smooth course of development.

_____

that he had "certainly not" established a schedule for contract completion with modification P00046.

[24] The Secretary of Defense discussed the Major Aircraft Review before the House Armed Services Committee on April 26, 1990. He faced mounting concerns about the federal budget deficit, however, and congressional demands for military budget reductions. He recommended continued funding for the A-12, but at reduced levels. The planned purchase of 858 aircraft with a maximum production rate of forty-eight per year would be reduced to 620 aircraft with a maximum production rate of thirty-six per year. This had a significant impact on the per-unit cost of the planes.

Weeks after testifying to Congress, the Secretary became aware of problems containing costs in the Program and maintaining the schedule. He was troubled because his report only weeks earlier had not reflected these concerns. He had testified in glowing terms about the aircraft and the contributions that it would make to the Fleet. The Defense Secretary was embarrassed and annoyed that he had to return with a different assessment for the Committee so soon. He had to report that the Program was seriously behind schedule and the projected cost of completion exceeded earlier estimates. The Secretary met with the contractors during the Summer of 1990 to address his concerns. He reiterated to the contractors his belief that the A-12 was a high-priority Navy program, however.

Two reports published in November 1990 had an impact on the A-12 Program. Both were critical of the Pentagon's part in the Major Aircraft Review. The Beach Report criticized the Navy's finding that the contract could be completed within its ceiling price, concluding that the program manager should have anticipated the extent of schedule risk. It criticized other Navy officials close to the Program as well. The other report, from the Department of Defense Inspector General, found that the Major Aircraft Review had not been conducted properly and otherwise was handled poorly.[25]

The Secretary of Defense signaled in December 1990 that he no longer supported continuation of the A-12 Program. He wrote a classified memorandum to the President expressing his disappointment in the A-12 Program, the Navy's handling of production, and the Major Aircraft Review. He stated that he would take corrective action promptly. The Under Secretary of Defense for Acquisition resigned.

---

[25] The Secretary of Defense stated during his pre-trial deposition, "[t]he [Inspector General] has generally done good work for the Department of Defense. I don't always agree with them, but sometimes they produce good results. In this particular case, they recommended termination for default, which is what I ultimately did."

DOD counsel advised that the quoted excerpt from the deposition should read, "[i]n this particular case, we recommended termination for default which is what we ultimately did." (emphasis added). Government counsel presented the Secretary an errata sheet before trial. The Defense Secretary agreed that counsel's suggestions of error reflected more accurately what he believed occurred. If so, the decision presented by Admiral Morris on January 7, 1991 may have been removed yet another level, to the Inspector General's office. The Inspector General did not testify; his or her name did not arise during trial. The errata sheet was provided to plaintiffs' counsel and the court the morning of the Defense Secretary's trial testimony.

Citing "serious shortcomings" in the A-12 Program, the Secretary directed his Deputy to evaluate the A-12 and report back in ten days. OSD instructed the Navy to "show cause" by January 4, 1991, why the Defense Department should not cancel the Program. The show cause letter stated:

> The A-12 Program is in serious trouble. The apparent schedule slippage, cost growth, and management deficiencies in this Program are intolerable. If we cannot spend the taxpayers' money wisely, we will not spend it. Accordingly, I direct you to show cause by January 4, 1991 why the Department should not terminate the A-12 Program and pursue other alternatives.

Admiral Morris was the contracting officer then, but the Office of the Secretary of Defense had taken over management of the A-12 contract and the A-12 Program. OSD instructed the contracting officer to issue a notice to cure on December 17. Admiral Morris notified McDonnell Douglas and General Dynamics that the contractors' performance was "unsatisfactory." The cure notice to the contractors included the following warning:

> [T]he Government considers your performance . . . unsatisfactory. Specifically, you have failed to fabricate parts sufficient to permit final assembly in time to meet the schedule for delivery of FSED aircraft. In addition, you will not deliver the Lot I pilot production aircraft in accordance with the contract schedule. Moreover, your failure to meet specification requirements, such as aircraft weight,[26] jeopardizes the carrier suitability of your design.

The contracting officer stated that such conditions were "endangering performance of [the] contract" and unless the problems were "cured by 2 January 1991 the Government may terminate for default" pursuant to FAR 52.249-9.

Admiral Morris explained his purpose in issuing the notice:

> The purpose of the cure notice was to advise the contractors they were failing to make progress, and that the Navy was extremely concerned that it would . . . be able to get an aircraft that would satisfy its intended purpose in buying the aircraft. And so this was a means of asking the contractors to address the many issues that were being communicated to the contractors through various people through various means at the time, and to tell the Navy what it was going to do to address those issues.

---

[26] OSD's legal department directed the contracting officer to include weight of the aircraft as one of plaintiffs' deficiencies. This was incorrect. See McDonnell Douglas, 50 Fed. Cl. at 323; McDonnell Douglas, 35 Fed. Cl. at 373-74.

The notice to cure was an item on the checklist of requirements the Government must follow before terminating a contract for default. For all practical purposes, the decision to terminate had been made, but the notice created a sense of urgency among the parties. The notice also set off a series of high-level meetings among the principals.

## 2. Meetings Before Termination

Plaintiffs met with government officials on December 18, the day after the Navy issued the cure notice. The Government was represented by Donald J. Yockey, Acting Under Secretary of Defense (Acquisition), Terrence O'Donnell, General Counsel, DOD, Dennis Trosch, Associate General Counsel, DOD, Eleanor Spector, Deputy Assistant Secretary of Defense (Procurement), Gerald Cann, Assistant Secretary of the Navy (Research, Development & Acquisition), Craig King, General Counsel, Navy, and Rear Admiral William R. Morris, Assistant Commander for Contracts, NAVAIR, and contracting officer for the A-12.

The Contractors were represented by John McDonnell, CEO, McDonnell Douglas, and Jerry Johnston, President, McDonnell Douglas; and Bill Anders, CEO, General Dynamics, and Jim Mellor, President, General Dynamics. The purpose of the meeting was to discuss the contractors' response to the cure notice, and to decide whether perceived problems could be cured by January 2.

Mr. Anders conceded at the meeting that the aircraft was not on course. He said the A-12 would not fly in January 1991, and "[a]ll deficiencies cannot be corrected." He said plaintiffs would "do the best we can, [to] deliver a satisfactory aircraft for the Navy, [but] Mother Nature won't allow correction of all defects." He left it to the Navy to decide whether the contractors' best was "good enough." He added, however, "[i]t's going to be a good airplane, one I would like to fly."

Under Secretary Yockey wanted to know whether the contractors would complete the FSED contract regardless of the cost; that is, "for whatever it takes." Mr. McDonnell's response was, [the contract] "has got to get reformed to a cost-type contract or we cannot do it. We need some form of Public Law 85-804."[27]

Admiral Morris took notes at the meetings that were held in response to the notice to cure. He offered interpretations of comments made at those meetings during his testimony:

I think Mr. Yockey reaffirmed the fact that the Navy continued to have the [fixed-

---

[27] Pub. L. No. 85-804 authorizes the President of the United States to grant agencies the power to provide extraordinary relief in furtherance of national defense. 50 U.S.C. § 1431; see McDonnell Douglas, 50 Fed. Cl. at 314 n.2.

cost] requirement, and the question was, could the deficiencies be corrected so that essentially the Navy's requirement could be satisfied.  Mr. Anders responded by saying we're not going to be able to address those deficiencies by 2 January. All of the deficiencies that had been pointed out cannot be corrected.  Mother Nature, or laws of physics or what have you, will not allow all of those to be corrected, they'll do the best they can, and the Navy was going to have to decide whether that's good enough.

Plaintiffs asked Admiral Morris about oral communications he had with the contractors' representatives prior to January 2.  He testified to "three or four specific meetings or telephone discussions with both [contractors].  . . .  I believe they were using me as a sounding board for various ideas they had, in terms of the response to the cure notice . . . ."

Admiral Morris encouraged plaintiffs to address the problems of cost overruns, which he said was a "real issue," though he knew the contractors were bound to a fixed-price incentive contract.  He added, "[t]he contractors had clearly articulated during these meetings that they would require extraordinary relief under 85-804, or – and/or, at times, a restructure of the contract, which I believe had to take place under the authority of Public Law 85-804."

The contracting officer discussed some of the technical issues:

[T]here was much follow-through that had to take place on the part of the contractors to address the issues that had been identified there and, of course, there were many milestones ahead, including first flight and the OPEVAL and TECHEVAL, and all of the technical reviews that would assure that the Navy was getting its desired aircraft. . . .

Admiral Morris said the main issue with the schedule was, "when is all this going to take place?  When are we going to get the aircraft that had been contracted for? . . .  I was encouraging that realism be addressed and that we get everything on the table so that we can proceed and go forward. . . ."  Asked about possible alternatives to 85-804 relief, Admiral Morris said this:

It was very hard to put a boundary around each of the issues, if I may categorize them as cost, schedule and performance.  I was certainly seeking an opportunity to try to address each of those issues if, in fact, they could be addressed within the contract itself, without going forward with extraordinary relief and without having to restructure that contract . . . which I did not have the authority to do and which

28

would require 85-804 relief. . . .[28]

The contractors met with government officials many times in late December to discuss the A-12 contract.   At one such meeting, Assistant Secretary of the Navy (Research, Development, and Acquisition) Gerald Cann stated that the "Navy needs the A-12."  He added, however, "[b]oth companies have failed cost, schedule and performance."   He urged the contractors to respond to the cure notice because the Navy "need[s] to get back to SECNAV by 2 Jan, show cause to SECDEF by 4 Jan."   The Navy reported that it "want[s] to proceed with FSED and Lot I."

Secretary Yockey announced that the Secretary of Defense wanted a report on the program by January 4.  Mr. Yockey said the Secretary was "disturbed by program problems."  Mr. McDonnell stated that they "[m]ust work out of [the] problem together," but emphasized that the contractors were "not in default."  He asked, "where [do] we go from here?  Is there a way to go together?"  Mr. Anders agreed, stating that "[b]oth contractors and Government signed [the] contract.  It won't work if we don't solve [it] together."

Other important points from the minutes of this meeting relate to negotiations regarding restructure of the contract.  Mr. Anders wondered why the Government could not address a general solution.  "We jointly created a bad contract.  [The] Government has a responsibility also to fix the contract."  Mr. Anders noted that a "year ago[, the] Government estimated the contractors [were $]1.0 billion above ceiling. . . .  We have a mutually bad deal."

Mr. Cann informed plaintiffs that the Government's "response will depend on what contractor[s] propose."  He told them to "propose what loss you will take.  Government is not going to walk away from [a] valid contract.  There is a way under the law to deal with it – [the] Navy has to convince OSD, who has to convince SECDEF, who has to convince the Congress."

Secretary Yockey raised the contractors' complaint that they were not receiving sufficient progress payments quickly enough, and the suggestion that conversion to a cost-type contract would reduce the problem.  As transcribed from the notes, Mr. O'Donnell, General Counsel of DOD, remarked, "You estimate the EAC [Estimate at Completion] at 7.5B[illion dollars] for progress payments.  [That's] a 2.5B[illion dollar] overrun!"

Mr. Anders returned to the problem that Admiral Morris referred to as "physics."  Morris'

---

[28] The contractors' financial condition is a factor of importance in reviewing issues that may have contributed to justifiable default termination.  See McDonnell Douglas, 323 F.3d at 1017.  Admiral Morris testified that he was "in no position to judge the seriousness of the financial situation of either firm at that particular time . . . ."

notes of Anders' comments state, "Mother Nature remains a real challenge – [we are] on the edge of state-of-art.  Tough to nail down future costs."[29]

Notes of a Government-only meeting following the meeting with the contractors shows that government officials disagreed about how they should proceed.  Secretary Cann wanted the "contractors to tell us what they can do.  I don't want to provide [the] contractors our minimum requirements.[30]  I want to hear what they have to say first."

Ms. Spector thought they should provide "minimal requirements" to the contractors.  "If we don't give them any indication of what could be acceptable, they may be off the mark."  Secretary Yockey agreed with Mr. Cann that they should not "provide any basic requirements" as a first response.  "Lets hear from them first.  Its important that they think the problem through and tell us what they can or are willing to do."  Ms. Spector persisted:  "We need to list five or six basic things that need to be addressed.  They may only cover some of them if we don't."  Mr. O'Donnell observed that PL 85-804 relief would be "distasteful," and the contractors should know it.  Under Secretary Yockey agreed, adding, "[t]hat, combined with risks, indicate [the] contractors really have to make progress quickly."

The parties met again on December 21.  Meeting minutes reveal that the contractors' financial situation and the state of the A-12 Program were among the Government's concerns going forward.  Mr. Anders of General Dynamics understood the situation precisely, it turns out.  He offered the following remarks:

> I have reflected a lot on the last meeting.  Rumors abound.  You can hear any you want.  I hear how important the program is, how much the Navy needs it.  It's reassuring if that's the position we are in, but others say we are going through a "kubuki dance"[31] preparatory to a formal termination of the program.  Is it really a fait accompli that the program is dead?  Are there really two alternatives

---

[29] This was a key problem throughout, recognized by all parties:  The Government should not have attempted this project with a fixed-price contract; neither, of course, should the contractors have agreed to attempt it.

[30] The officials are discussing a possible restructure of the contract here.  The reference to "minimum requirements" refers to the Government's demand for consideration from plaintiffs.

[31] The reference to "kubuki" is not explained in the record.  We understand the term to be Japanese, referring to traditional Japanese theater distinguished by elaborate makeup.  It seems from the context that Mr. Anders was expressing concern that the Government might have been "stringing them along."

available?

Secretary Cann assured Mr. Anders that the Program was not "dead" if the Navy and the contractors could somehow convince the Pentagon to continue. Secretary Yockey added, "[i]t's a question of whether the program in its current state can satisfy the requirement. The question is, can you correct deficiencies to provide an aircraft that meets the requirements?"

The contractors had to demonstrate for the Government that they could perform according to A-12 contract requirements, despite setbacks that had already taken place. Mr. Anders attempted to describe the contractors' difficult task with respect to this research and development effort, urging the Government to understand that "[t]his is the state of the art. We can't guarantee in detail what the aircraft will do. We don't know the unknown unknowns." He assured the officials that nonetheless, "[h]aving been burned badly on large composites, we think we are out of the woods. All we can do is bust our tails."

The conversation turned to the contractors' financial situation. Secretary Yockey noted that the Government would not "take unlimited responsibility." He advised the contractors to "respond to the show cause [and to] articulate what you would like to do. In doing so, make sure you're taking responsibility and some continuing responsibility. If we consider it has merit, we will entertain your proposition."

Cost remained a concern, as did the fixed-price contract. Mr. McDonnell responded to criticism of the Secretary of Defense and others about plaintiffs' management issues as well. He said:

> The fixed price nature of the contract precluded good management. I did a study four years ago indicating we were heading down a slippery slope with fixed price contracts. We are not in the business of winning lawsuits. We would rather build airplanes. If we can work this out, we'll unleash everything on the Hill that we can to help.

Mr. McDonnell said the Navy should not terminate "because [it] think[s] Congress won't go along" with 85-804 relief.

Secretary Yockey reminded the contractors that the basis for the notice to cure was the contractors' not making progress. He felt the Government "ha[d] the right to terminate for default." He had a different worry about the prospect of negotiating with the contractors. That is, Mr. Yockey was concerned about whether the system would meet the Pentagon's needs in any event: "The worst problem is that if we were to propose a solution, we could end up with a product that didn't meet our requirement. I have concerns that the airplane will do all you need

it to do."[32]

The Government held another closed-door meeting immediately following the briefing with the contractors. Minutes of this meeting and others showed a disconnect between the Pentagon and the Navy. For example, the Navy felt that OSD personnel were impinging upon some of the Navy's areas of responsibility.

### 3. OSD v. Navy

The Navy and the Office of the Secretary of Defense were at odds regarding the A-12 Program in a number of respects, including the Pentagon's handling of the termination. At a closed-door meeting, Navy official Gerald Cann said he felt the contractors "kn[ew] what kind of solution they need to provide, [but] [t]hey are working serious cash flow issues. If we were to [terminate for default], we would cause major problems for them." Under Secretary Yockey's view was more practical, or perhaps pragmatic from the standpoint of OSD.

The meeting minutes describe the following exchange:

Cann: "We need to give you a technical brief. We have gone through 1-1/2 years of critical design review[] (CDR). The deficiencies are being addressed. We have growth areas in the plane. Trade offs will be made in terms of capabilities as long as our needs are met. This always occurs in a development program."

Yockey: "I will want to get a certificate of technical adequacy from both Navy and contractors. We have to make sure the product is suitable for our needs."

Cann: On [January] 3rd, I want to get my technical group over here to brief you so that you know where were are coming from. The technical issues have come together. There's still some risk but it's coming together.

Yockey: "It bothers me that we go out with a specification that we say is our requirement [yet] we never get it complete, such as in this case the weight of the aircraft which affects other requirements.[33]

---

[32] This is one of the issues the contractors would have wanted to pursue, presumably, had Mr. Yockey been available to testify in court. We have not located a record of Plaintiffs' having queried Admiral Morris about this comment during trial.

[33] The Navy was comfortable with the A-12's weight, which it accepted. The Navy waived contract specifications that required a lighter airplane. See supra note 26. The focus on weight was a major disconnect between OSD and the Navy, and a reason for the appearance that Pentagon officials terminated the contract without understanding facts well

Cann: "We lay out a specification that we want and think is necessary.  We don't always know that it can be achieved.  That's why we have development – need to make trade-offs to achieve overall requirement."

Yockey: "Why did we ever go out on a fixed price contract?  We should have learned long ago that you can't develop complex systems to a fixed price."

They agreed that no one wanted to suggest the Government encouraged the contractors.  Mr. Cann remarked, "[e]ven though we don't know what they are going to do on [January 2], I don't want to be in a position of having encouraged them to do one thing or another.  We need to hear from them."  Secretary Yockey concurred:  "I don't want to be in a position of encouraging them to do one thing or another.  We need to hear from them and then put together a strategy of what we would recommend for [the Secretary of Defense]."

Government officials discussed business issues in depth.  Secretary Yockey estimated that the A-12 contract's cost to completion would be between $8 and $12 billion.  They considered whether the contractors could handle loss of this magnitude.[34]  Mr. Yockey understood how desperate the contractors were for cash.  He believed the contractors could not continue performing with such losses; he did not want the losses to be shared equally between the contractors and the Government.  He felt the Secretary of Defense "has to send strong message to industry."

### 4.  Contractors Respond to Cure Notice

The contractors responded to the Navy's cure notice on January 2, denying they were in default of the A-12 contract.  They asserted that the unilateral schedule was not enforceable and the contract specifications were not achievable.  They added, "[w]hile the contractors will not

---

known to the Navy.

[34] They could not handle such a loss.  Mr. Lamers of General Dynamics made the following comments at a meeting of contractors:

[W]hat are we going to do to resolve this impasse with the Navy?  Right now, we have – the two chairmen of the two companies are in continual communication with Navy acquisition executive, who is Gerry Cann, and they are working with him to come up with an acceptable package or agreement that will recognize the fact that while the contracts are behind schedule, and therefore in a dollar overrun situation, the contractor cannot absorb all those – all that overrun, . . . .

meet the delivery schedule or certain specifications of the original contract, or the revised FSED delivery schedule . . . for the reasons set forth below, the contractors are not in default of the A-12 contract."

> As the Program has developed, it has become clear both to the Team and to the Navy that the schedules and certain of the specification requirements, such as weight, were impossible to satisfy.
> . . .
> The Contractors have been forthright with the Navy through this Program in surfacing problems as they have developed.  We have worked with the Navy in good faith to overcome these problems and to deliver the best possible aircraft.  The Navy cannot now ignore the fact that it has been informed of the difficulties, or that it has encouraged the Team to continue performance despite its knowledge that the delivery schedules and the literal terms of certain specification requirements were not achievable, nor can the Navy deny that the Team, in reliance on those encouragements, has diligently prosecuted the work at enormous expense to both companies.
> . . .
> [T]he Team has been fully committed to the success of the Program, and has diligently prosecuted the work relating to fabrication of parts and all other aspects of performance in a manner that reasonably assures a satisfactory completion of the FSED and production phases of the A-12 Program.

Much of this comports with the court's understanding of the case.  The contractors certainly cooperated with the Navy and they worked closely with each other to "surface[] problems as they developed."  A review of the record shows that overall, this was more a dispute between the Navy and OSD than one of Government versus Contractors.  The contractors offered the following assurances:

> First, with respect to the design and manufacturing process, the Team has made significant progress in the past several months.  Nearly all structural drawings have been released to manufacturing.  Since July 1990, 2,030 tools have been completed.  Manufacturing processes and yields are dramatically improved.
> . . .
> Second, the Team has made major advances in the A-12 Test Program.  Wind Tunnel tests are 92% complete, well ahead of need as measured against current schedules. . . . Survivability and vulnerability testing, not even required for first flight, is 77% complete, and all tests will be complete prior to first flight.

> Third, . . . substantially all of the approximately 20,000 procured line items will be available to meet manufacturing need dates, and, as of November 30, 1990, 95% of Aircraft 1 procured requirements have already been purchased and

34

delivered.

. . .

The [cure] notice . . . states that the Team's alleged "failure to meet specification requirements, such as aircraft weight, jeopardizes the carrier suitability of your design." The team's design for the A-12 was found to be technically sound during the exhaustive Critical Design Review. While there is a shortfall against some parameters of the original technical specification, we believe that the current design meets the operational objectives.

. . .

[D]espite the exceptionally difficult technical challenge presented by this revolutionary design, during the Design Review Board (DRB) process that was completed in October 1990, the Team convincingly demonstrated that the A-12 design is technically satisfactory. Over 400 significant technical issues were addressed and resolved during this DRB process.

. . .

[C]ontractor development and manufacturing activities have been substantially and excusably delayed and impacted by acts and omissions of the government. Very important information vital to the performance of the contract, available to the Government, was not provided. . . . For those same and other reasons, the schedule unilaterally imposed by the Navy is also not valid; and, furthermore, it is unreasonable inasmuch as it purports to schedule FSED aircraft deliveries after delivery of Lot I aircraft.

The contractors concluded:

We provide this response to demonstrate our commitment to the Program, and specifically to address the concerns you have raised. Our greater objective is to conclude successfully an equitable restructure of the contract and clear the way for the design and delivery to the Navy of superior new attack aircraft . . . .

The contractors' response accompanied a separate "Proposal for Equitable Restructure of the A-12 Contract." They asked that the contract be converted to cost-reimbursement and agreed to absorb a $1.5 billion loss on the contract in return. They would waive all claims for equitable adjustments of approximately $1.6 billion. Cash flow to the contractors would be made on the basis of flexible progress payments, and the parties would restructure the contract so that procurements subsequent to Lot I would be subject to separate, future stand-alone contracts.[35]

---

[35] Secretary Yockey had no concern that the contractors were incompetent or otherwise unable to handle the A-12 contract; he was worried about the appearance of a "bailout" if he allowed plaintiffs to continue. He would have been willing to go forward if

5.  The Weekend

The Chief Engineer for the Navy reported at a meeting with Admiral Morris on Friday, January 4, that technical challenges on the A-12 were typical for this type of development contract, and that the contractors could resolve the remaining technical challenges.  The Navy and the Joint Requirements Oversight Council had revalidated the operational requirements.[36] Despite this optimistic assessment of progress in resolving technical problems, OSD seemed determined to close down the Program.

The Secretary of Defense met with Navy Secretary Garrett, Under Secretary Yockey, and the Chairman of the Joint Chiefs of Staff on Saturday, January 5 and decided not to grant 85-804 relief.  Secretary Cheney knew the A-12 Program would be cancelled as a result, but he testified that the Navy would decide whether to terminate the A-12 contract.[37]

Admiral Morris was not invited to the Defense Secretary's meetings with top military personnel on Friday and Saturday, and he did not know of the meetings' outcome.  He was called in to meet with Secretary Yockey and other Department of Defense officials on Sunday, January 6.  Secretary Yockey told Admiral Morris that Secretary Cheney would not provide 85-804 relief.[38]  Yockey told Admiral Morris that he, "as the milestone decision authority, can no longer support the program because of cost, schedule, [and] performance problems, and I will not

---

the contractors could have accepted a $2 billion loss and made other concessions.  See McDonnell Douglas, 50 Fed. Cl. at 314 n.3 (concluding that Mr. Yockey, the major decision-maker on the scene at the time, was merely "haggling over price.").

[36] This optimistic assessment was the contracting officer's last official report on the status of the A-12 Program before Monday, January 7, when he terminated the contract for default.  The Joint Requirement Oversight Council, or JROC, consisted of members from the Joint Chiefs of Staff.  JROC conducted its own review of the A-12 requirements and concluded that the aircraft "satisfies all mission requirements."  McDonnell Douglas, 35 Fed. Cl. at 363.

[37] This distinction resolved an apparent dilemma among counsel for defendant and for OSD regarding the role that the OSD was to have played; i.e., whether the Secretary was to have been removed from decision-making regarding termination, or involved, and to what extent.

[38] This is another circumstance about which plaintiffs surely would have wanted to question Mr. Yockey.  We inferred that Admiral Morris received his instructions regarding default termination at this meeting.

authorize the obligation of any additional funds for the program."[39]

That Sunday afternoon, Admiral Morris contacted NAVAIR's Navy's legal counsel, Margaret Olsen, to tell her he was prepared to terminate the A-12 contract. He terminated the contract for default the next day.[40]  The contractors were due an installment of $553 million the same day, January 7, 1991.

The contracting officer's termination letter to the contractors stated:

General Dynamics Corporation and McDonnell Douglas Corporation (hereafter Team) are in default of [the] Contract. . . . The Government, therefore, is terminating [the Contract] in accordance with FAR clause 52.249-8, "Default (Fixed-Price Supply and Service)" and 52.249-9, "Default (Fixed Price Research and Development)." . . .

This action is based on the Team's inability to complete the design, development, fabrication, assembly and test of the A-12 aircraft within the contract schedule

---

[39] Secretary Yockey, the person who carried the termination message to Admiral Morris, who played a major role in causing the contracting officer to terminate the contract he wanted to continue, and whose name appears on many pages of this Opinion, did not testify in any court proceedings.  We found after the Count XVII trial that Mr. Yockey "recommended against both 85-804 relief and the continuation of the program because the contractors were not willing to accept a sufficient loss on the contract. . . . [and] that 85-804 would look like a bailout of the contractors." McDonnell Douglas, 35 Fed. Cl. at 365.  The only route Yockey thought appropriate was termination.  He wanted to terminate for default immediately, before more funds were obligated.  Id.

[40] Following his meeting with Secretary Yockey, Admiral Morris contacted his supervisor, Admiral Gentz, and told him that the Defense Department would not authorize Public Law 85-804 relief, and that Secretary Yockey had withdrawn his support for the Program.  This was Admiral Morris' last-ditch effort to save the Program.  He hoped Admiral Gentz would encourage the "big guns" in the Fleet to try one last time to save the A-12. Despite this lack of high-level support, Admiral Morris wanted an opportunity to continue development.  He laid out reasons for continuation without extraordinary relief.  He did not think additional funding was the only way to sustain the Program, and he wanted to work with the contractors.  On the day before termination for default, despite being denied "extraordinary relief," the contracting officer wanted to continue the contract.  The same afternoon, however, he called a NAVAIR attorney to alert her concerning the likelihood of termination.  The next day, he terminated plaintiffs for default.

and the Team's inability to deliver an aircraft that meets contract requirements.

Neither Admiral Morris nor his counsel had the time to put together a termination letter for the contractors and a termination memorandum to justify the Government's action for the file. Some of the reasons for termination used in the memorandum resulted from directions of OSD's legal department. As a result, both documents cited reasons for default that previously the Navy had not considered reasonable bases for such action. The Navy had worked side-by-side with the contractors for many months preceding termination to resolve technical difficulties inherent in designing a plane that would be stealthy, yet land on an aircraft carrier and meet other needs of the Navy.

Ms. Olsen prepared a termination memorandum in the early morning hours on the day of termination. She did not have much information about the A-12 contract at her disposal, so she used a termination letter from a previous Navy program as a template. She had not anticipated terminating the A-12 for default. Ms. Olsen used the P-7 for more than a baseline, however. She looked to language from the P-7 for substantive reasons for terminating the A-12, a major research and development procurement, for default. Thus, the contracting officer's termination memorandum for the A-12 reflects an analysis conducted for the P-7 program, not the merits plaintiffs' performance on the A-12. Language in the P-7 memorandum is identical to language of the A-12 document.[41] Ms. Olsen was questioned about the similarities when she testified:

> Q: Now, let's look at the further statement for "two or more years' delay in the completion of development," do you see that phrase?
>
> A: Yes.
>
> Q: Do you know where you got that?
>
> A: No, I don't recall.
>
> Q: Now, Ms. Olsen, that's exactly the language that you put in the Lockheed [P-7] memorandum, isn't that right?
>
> A: Yes.
>
> Q: Is it also possible that you had not verified that two or more years was appropriate to the A-12?
>
> A: And it's also possible that two or more years was the amount of delay projected in both programs.

Ms. Olsen had no idea what the basic issues involving the A-12 were, and did not have time to

---

[41] The P-7 memorandum stated, "Lockheed has made no case that two or more years' delay in the completion of development is other than Lockheed's fault. . . ." The A-12 Memorandum included the following: "[t]he Team has made no case that . . . two or more years' delay in the completion of development is other than the Team's fault."

find out.  Whether the contractors were two or more years behind is an important aspect of the case before us now.

Ms. Olsen was aware of correspondence between the contractors and the Navy, but had not seen the contractors' claims or their response to the cure notice.  Her staff gathered information on the A-12 Program.  She did not discuss the basis for termination with Admiral Morris.  She did not seek information from the chief engineer, the program manager, or any technical personnel.  She did not discuss the termination letter with Admiral Morris, though he issued it to the contractors later that day.[42]

Admiral Morris' January 7 termination memorandum for the file was an in-house document that explained the rationale for termination:

> After considering the factors set forth in Federal Acquisition Regulation 49.402-3(f), I have determined to terminate this contract for the default of the Contractor.
> . . .
> The contract includes the [default] clause . . ., which can be found at FAR 52.249-9; and this clause, at paragraph (a)(1)(iii), provides that the contract may be terminated for default if the contract so fails to make progress as to endanger performance of the contract.  As outlined below, the Contractor's performance evidences an inability or unwillingness[43] of this contractor to meet the requirements of the contract.  The team has made no case that three to nine months further delay in the delivery of the first aircraft or two or more years' delay in the completion of development is other than the team's fault, or that it is entitled to be relieved of the performance requirements of its contract.

> Specifically, the team cannot deliver the first prototype aircraft required . . . in December 1991.  Since June 1990, the team has consistently reported its delays; and the Navy's independent review confirmed that, given the state of the team's development efforts, delivery of aircraft and completion of related contract

---

[42] "Morris approved the termination memorandum at midday after less than an hour of review."  McDonnell Douglas, 35 Fed. Cl. at 368.  The A-12 termination memorandum did not reflect any contracting officer analysis of the time when the A-12 contractors were likely to complete the remaining contract effort.  See id. ("[Admiral Morris] did not review documents related to schedule or specifications.").

[43] No one else has suggested that the contractors were "unwilling" to build this aircraft.  Admiral Morris certainly knew better.  Presumably, Ms. Olsen copied that clause from the P-7 template.

requirements could occur no sooner than _____. [sic][44]

The importance of this delay cannot be overstated. The production options must be exercised by dates certain to be enforceable. As a consequence of the team's delay, the Navy would be required to purchase production aircraft before verifying that the aircraft are operationally suitable and effective[45]. . . . Moreover, the delay so increases the cost to the team of completing the contract that it casts doubt on their willingness to perform.

Specifically, the team cannot meet the performance requirements of the contract. The team is currently designing the aircraft to have a weight empty 7930 pounds in excess of the guaranteed contract weight empty. This additional weight precludes the team from meeting contract requirements for takeoff distance, cruise specific range, maximum airspeed, and fuel flow, all of which directly affect mission capability.[46]

Excuses offered by the team are as follows. First, the team contends that its development and manufacturing activities have been substantially affected by acts and omissions of the Government. Specifically, the team alleges that the Government failed to provide "very important information vital to the performance of the contract" that was available to the Government. Second, the team alleges that necessary risk reduction prior to the award of a fixed price development contract was not present in this effort. Intertwined is the argument that meeting the required weight called for by the specification is impossible.

_____

[44] Despite his assertion that "[t]he importance of this delay cannot be overstated," the contracting officer did not know what the delay was. Yet the contractors and the Navy had discussed estimates for first flight. The Navy had told Secretary Cheney that the first flight date was expected in September 1992. Navy witnesses agreed that the September 1992 date was realistic and acceptable.

[45] The A-12 contract required that the Navy exercise all options to purchase production lots "before verifying that the aircraft are operationally suitable and effective." This justification therefore either was taken from the P-7 or invented by someone. A witness for the Government, Eleanor Spector, testified that this element of the contract schedule was a "risk" known before the contract award, and not "a consequence of the team's delay."

[46] Weight was not a problem for the Navy at termination. The design review process described earlier insured that the plane could take off and land on a carrier and otherwise would meet the Navy's stringent requirements for such a system. Using weight as a reason for termination was not Admiral Morris' idea, nor Ms. Olsen's, but that of the Office of Secretary of Defense.

Third, the team argues that its obligation to perform is limited to amount of funds available, provided through incremental Government funding.  Finally the team argues that the schedule is not valid and is unreasonable because it purports to Schedule FSED aircraft deliveries after delivery of Lot I aircraft.

The termination memorandum continued by addressing the contractors' assertions in response to the cure notice.

The Government has provided the team all information relevant to the performance of this contract that the Government was required contractually to provide . . . .

The weight guaranty in the contract specification was provided by the team.  The team is currently projecting weight at 7930 pounds over the required weight which critically calls into question the aircraft's suitability for carrier operations.  The added weight impairs the Aircraft's single engine rate of climb and increases substantially wind over deck requirements; both serious considerations for carrier operations.  The team has provided no valid excuse for not meeting the contract weight that it submitted and agreed to meet.

This contract is a fixed price contract that requires delivery of conforming goods by a date certain conditioned on the Government allotting funds in the amounts and at the times stated.  It is not a cost type of contract where the contract is only required to work to the limit of available funds.

Finally, the overlapping schedule of FSD and Lot I deliveries does not relieve the team of the requirement to meet either Schedule.  The FSD schedule was extended after the team failed to meet the original Schedule in the contract.  The Lot I schedule could not be extended at the same time because too much uncertainty surrounded the team's ability or willingness to perform to any Schedule.

In summary, the team's failure to make progress and to deliver an aircraft meeting required weight has placed the entire program in jeopardy; and the contractors have offered no adequate excuse for these failures.

Mr. Cann's January 8, 1991 handwritten notes include this retrospective judgement: "Uncertainty was what did it in . . . ."  Perhaps, but the decision to terminate the A-12 contract was driven by the $553 million progress payment that the Navy was to obligate on the same day.  The Government's largest procurement ended in a weekend effort by Department of Defense officials to avoid the Government's own default by failing to release half-billion dollars to plaintiffs on Monday, January 7, 1991.

## E.  LITIGATION HISTORY

The United States terminated its contract with McDonnell Douglas and General Dynamics, citing the contractors' inability to meet contract requirements and failure to make progress.[47]  Plaintiffs sued to convert the termination for default to termination for convenience of the Government.  Following trial, we ruled that the Navy's termination process was not a reasoned one and that the contracting officer had not been permitted to exercise the independence required of him by Federal Acquisition Regulations.[48]  McDonnell Douglas, 35 Fed. Cl. at 368-73.  Testimony and other evidence at the first trial showed that Admiral Morris terminated the contract mostly for reasons we thought unrelated to performance.

Defendant argued initially that government officials could have terminated the contract in Admiral Morris' stead, and had the authority to act on the contracting officer's behalf in any event.  We stated, "[p]erhaps [other government officials] could have terminated the contract – we had no reason to address this issue. . . . [T]he Government offered no individual or entity other than the contracting officer as the decision-maker.  In fact, defendant's witnesses disclaimed such a function during trial."  Id. at 372.  Defendant apparently abandoned that legal

---

[47] The contracting officer issued a final decision pursuant to the Contract Disputes Act, stating as follows:

On 17 December 1990, the Navy informed the Team that it considered conditions under the contract to endanger performance and asked the Team to cure those conditions.  Having carefully considered the Team's 2 January 1991 response, I conclude that the Team has failed to explain or cure those conditions, and that the Team is in default of the contract for having failed to make progress and not meeting contract requirements.  The A-12 aircraft will not be delivered within the contract schedule nor will it meet the weight guaranty contained within the contract specification.
. . .
This is the final decision of the Contracting Officer. . . .

[48] The contracting officer is a government employee with the responsibility of administering a contract for the contracting agency.  Federal regulations require that he or she act as an independent arbiter to resolve disputes that arise with the contractor by "safeguarding the interests of the United States in its contractual relationships . . . . [while] . . . [e]nsur[ing] that contractors receive impartial, fair, and equitable treatment."  FAR 1.602-2.  We were impressed with the contracting officer in this case, a well-regarded, high-ranking naval officer who nevertheless was unable to administer the contract according to his best judgment.

position later, and took pains to disclaim such activity by other government officials.[49]

The first opinion on this issue described the process leading up to termination in some detail to explain why it appeared that Admiral Morris did not make an independent decision to terminate the Program for default on the same day that he had been lobbying the Fleet for support to keep it going.[50]   The ruling of the Court of Appeals for the Federal Circuit that Admiral Morris terminated the contract for performance-related reasons and exercised independent judgment apparently derived from Admiral Morris' testimony at trial.  McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327-28 (Fed. Cir. 1999).[51]  The court found that it could be guided by Admiral Morris' testimony, stating:

> [The contractors] were in default because they acknowledged they would not be

---

[49] Defendant argued that the role OSD did play in the termination did not nullify the default termination, however.  According to defendant, the termination for default was the "'direct consequence of a legitimate exercise of OSD's statutory and regulatory oversight authority; [t]hat the discretion of the contracting officer regarding contract continuation may have been obviated by OSD's actions is of no consequence.'"  McDonnell Douglas, 35 Fed. Cl. at 372.  We had misgivings about that argument at the time, but rulings since then may have vindicated the Government's position.  The matter did not arise again, however, because later the Government denied any influence or other actions on the Secretary's part.

[50] Admiral Morris was impressive as a conscientious witness and a flag officer of the United States Navy.  Given the Federal Circuit's conclusions on remand, we must assume that once Admiral Morris understood the importance of the Government's right to terminate in the circumstances presented to him, he then conducted the necessary reviews and made a reasoned decision to terminate for default.

[51] The Navy and the Secretary of Defense disagreed in their assessments of the A-12 Program and their willingness to tolerate delay.  The Navy wanted the A-12 for its Fleet and was prepared for compromise.  The Secretary had other concerns and was more critical of the Program.  According to the Circuit:

> The trial court's factual findings do in fact establish that the Navy did not want to terminate the A-12 Program.  Instead, at all times up until the very end, the Navy hoped to preserve the Program and its A-12 aircraft.  That is not to say, however, that Contractors were not in default under the contract, or that the Government did not have the right to terminate for default.

McDonnell Douglas, 182 F.3d at 1327.  The appeals court concluded that the Navy's reluctance to terminate the contract was indicative of the serious nature of the contractors' default.  Id.

> able to achieve the contract specifications and the contract requirements, . . . the[y] would not be able to meet the delivery schedule that was currently in the contract, [a]nd . . . they would not be able to perform the contract without extraordinary relief or additional funding for the contract. So they basically said they can't perform under the contract and they were in default of it.

Id. at 1327. He said he believed the contractors could not complete the project within the time allowed for performance. The Circuit noted Admiral Morris' testimony with approval:

> [A]s a result of the contractors' default, it would be nothing short of unconscionable for me to put the burden of the contractors' failure to make progress and the contractors' failure to fabricate parts, so as to endanger performance of the contract, put that burden on the Government and the taxpayer to reimburse all costs and to pay the contractors a profit for their failures.

Id. at 1328. The appeals court made the following conclusion from Admiral Morris' testimony:

> [Admiral Morris] thought that he had three choices: to terminate for convenience, to terminate for default, or to do nothing. He rejected the latter as 'irresponsible,' thus focusing his attention on the other two choices. He eliminated the termination for convenience first, because he believed Contractors to be in material breach of the contract.

Id. at 1327. Thus, Admiral Morris terminated the contractors because he believed that they were in default of the A-12 contract, and it would have been unconscionable and irresponsible for him to terminate for convenience or do nothing.

The Circuit's remand order stated that the court so far had addressed only procedural matters and directed trial on whether the contractors were actually in default at termination. The burden of proving plaintiffs were in default was on the Government, which offered justifications for its termination of the A-12 contract during the six-week default trial that ensued. The parties did not try this case on the Lisbon test, but on the contractors' failure to meet the contract schedule. We had ruled earlier on the Government's other reasons for terminating plaintiffs for default: weight of the aircraft, plaintiffs' financial status, and repudiation or abandonment. It appeared then that schedule was the only issue remaining.

The modified schedule called for first flight nearly a year after the Government terminated plaintiffs for default, but first flight was only an "interim deadline."[52] The contractors

---

[52] First flight was important and significant to those close to the A-12 contract. The significance arose from the parties' negotiations in the months leading to termination. The

and the Navy had known that plaintiffs would not make first flight, so the issue for trial was whether the unilateral schedule known as P00046 was reasonable and enforceable. A unilateral schedule must be reasonable to be enforceable, so testimony centered on whether the Navy was reasonable in imposing a December 1991 first flight deadline.

Testimony showed that the schedule was reasonable, and we entered judgment for the Government. The Federal Circuit ruled on appeal, "finding that the unmet first flight date in December 1991 was reasonable is insufficient to sustain a default termination in this case." McDonnell Douglas, 323 F.3d at 1014.[53] The Circuit explained, "[i]n determining whether a default termination was justified, [trial] court[s] must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues." Id. The appeals court vacated the judgment and remanded for review of whether the default termination was justified according to the Lisbon standard. Id. at 1015.[54]

_____

contractors' ability to conform to the first flight schedule had been a bellwether of sorts, and a concern of government officials. First flight was the first test. Missed milestones may be considered in conjunction with other factors in weighing the contracting officer's decision to terminate for failure to make progress.

[53] We did not find that the due date for first flight was "unmet." If it had been, perhaps the issue would have been analyzed differently. This is important because the Government terminated plaintiffs almost a year prior to first flight. At termination, January 7, 1991, the parties understood that McDonnell Douglas and General Dynamics would not deliver first flight a year later, in December 1991. This is the reason the second trial focused on enforceability of the unilateral schedule. If the unilateral schedule had not been found reasonable, it would not have been enforceable.

[54] The Circuit did not express an opinion on whether we should reopen the record; the matter would be left to the sound discretion of the trial court. For that reason, we asked the parties repeatedly whether they recommended additional trial. Plaintiffs and defendant opposed reopening the record or taking additional testimony for any purpose. The parties agreed that the court has sufficient information in the trial record to rule on remand. Though the Federal Circuit expressed its inability to rule on "an incomplete record," the court was referring to the appellate record, according to defendant. Government counsel explained during a hearing last year:

> [T]he Federal Circuit told us that the appellate record before it on the last appeal was inadequate to answer [the question of whether the Government justifiably default terminated the contractors for failure to make progress], so it had no choice but to remand the case back to this Court . . . .

All of the answers to those questions were in this trial court record.

This brief summary of developments in this case is limited to matters directly antecedent to this issues presented.  These are the nature of the contract; the contractors' performance before termination, including the contract schedule; events leading to termination, including a number of earlier factual findings that are relevant to contracting officer's testimony and contemporary evidence; and the litigation that resulted from the Government's termination of plaintiffs for default.  It does not address separate trials concerning matters raised by plaintiffs' complaint, or dispositive orders and other rulings on coordinate issues.  The issue remaining is whether default termination was justified according to the <u>Lisbon</u> standard.

## II. DISCUSSION

Default termination is a "drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence."  <u>J.D. Hedin Constr. Co. v. United States</u>, 408 F.2d 424, 431 (Cl. Ct. 1969) (internal citation omitted).  Termination is a forfeiture that is disfavored in the law and to be construed narrowly by the courts.  <u>DeVito</u>, 413 F.2d at 1153.  The Government must prove default: "If the [G]overnment can establish that [the] Contractors were in default, then the termination for default would be valid."  <u>McDonnell Douglas</u>, 182 F.3d at 1329 (citing <u>Lisbon</u>, 828 F.2d at 765).  This court reviews a contracting officer's decision to terminate for default <u>de novo</u>.  41 U.S.C. § 609(a)(3); <u>see also</u> <u>McDonnell Douglas</u>, 323 F.3d at 1018 n.3 (citing <u>Wilner v. United States</u>, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (<u>en banc</u>)).

The Government's authority to terminate the A-12 contract for default derives from FAR 52.249-9, which the contract incorporated by reference.  The default section for fixed-price research and development contracts states, "[t]he Government may, . . . by written Notice of Default to the Contractor, terminate this contract in whole or in part if the Contractor fails to – . . . [p]rosecute the work so as to endanger performance of this contract . . . ."  48 C.F.R. § 52.249-9.

Early cases ruled that timely completion must be impossible before the agency may terminate a contract for failure to make progress.  <u>See</u> John Cibinic, Jr. & Ralph C. Nash, Jr., <u>Administration of Government Contracts</u> 930 (3d ed. 1994) (noting that while the default clause

---

Unfortunately, because of the way the arguments got briefed and the appendix assembled for the Court of Appeals, the answers to those questions and the necessary documents from this trial court's record were not included in the appellate record, so the Court remanded it.

Government counsel also expressed concern during a hearing last year that additional trial may be needed to address defendant's claim for a loss adjustment.  That issue is moot now, given the judgment we enter today.

uses the phrase "endanger performance," the Government was required to show that "it was impossible for the contractor to complete by the due date"). Current law does not require impossibility, or repudiation or abandonment by the contractors, but a showing by the Government of a demonstrated lack of diligence. McDonnell Douglas, 323 F.3d at 1015 ("[T]he default clause in this contract did not require a finding that completion within the contract's time limitations was impossible.") (citing Discount Co. v. United States, 554 F.2d 435, 441 (Ct. Cl. 1977); Universal Fiberglass Corp. v. United States, 537 F.2d 393, 398 (Ct. Cl. 1969)). Termination for default for failure to make progress usually occurs where the Government believes a contractor is so far behind schedule that completion of the job within the time remaining for performance is unlikely. See Hannon Elec. Co. v. United States. 31 Fed. Cl. 135, 143 (1994).

The Federal Circuit apparently found little agreement between plaintiffs and defendant on the standards this court should apply to a review of the contracting officer's decision to terminate. See McDonnell Douglas, 323 F.3d at 1014 (noting the parties "advance[d] drastically opposite interpretations" of the FAR default provision). The contractors argued the "absolute impossibility of performance" requirement of earlier cases, but the Circuit ruled "complete repudiation or abandonment" was no longer necessary. Defendant asserted on appeal that this case presents issues of first impression: "[T]he circumstances of this case are so different that [the Court of Appeals for the Federal Circuit] should not seek guidance from precedent." Id. at 1015. The Government reasoned that "default termination was appropriate here given the Contractors' admitted inability to meet an interim contract milestone, the alleged impossibility for the aircraft design to meet contract specifications, and the Contractors' request for a restructuring of the agreement." Id.

The Federal Circuit resolved the matter with a "pragmatic approach" taken from the ruling in Lisbon. Id. According to the Circuit, Lisbon provides "the proper interpretation of the default provision [that] lies somewhere between the parties' extreme positions . . . ." Id. Its pragmatic approach also achieves a desired "balance between judicial aversion to default terminations . . . . and the fact that the Government, just as any other party, is entitled to receive that for which it contracted . . . ." Id. (internal citations and quotation marks omitted).

The Navy's default termination was justified if plaintiffs were in default of the A-12 contract on January 7, 1991. See McDonnell Douglas, 182 F.3d at 1329. According to Lisbon, plaintiffs were in default for failing to make progress on the A-12 contract at termination if the Government proves that at termination the contracting officer had a reasonable belief "that there was no reasonable likelihood that the contractor[s] could perform the entire contract effort within the time remaining for contract performance." McDonnell Douglas, 323 F.3d at 1016 (quoting Lisbon, 828 F.2d at 765). The Federal Circuit discussed the importance of "decid[ing] the actual performance that the contract requires and the amount of time remaining for performance" before deciding whether there was no reasonable likelihood "the contractor[s] could perform the entire contract effort within the time remaining for contract performance." McDonnell Douglas, 323

F.3d at 1017.

The remand order describes three important tasks:

(1) finding the "entire contract effort";

(2) finding the "time remaining for contract performance" at termination;[55] and

(3) deciding whether the contracting officer reasonably determined that the contractors could not be expected to perform the entire contract effort within the time remaining for performance.[56]

## A.  THE PARTIES' ARGUMENTS

The contractors urge a broad interpretation of the Circuit's ruling in <u>Lisbon</u>.  The appeals court used the term "entire contract effort" repeatedly and with emphasis.  This must mean the court is to include eight FSED aircraft and six Lot I production aircraft in the fraction showing amount of work completed, plaintiffs contend.  Their interest is in stretching the contract term out so they could clearly have met the timing requirements eventually.  The longer their time remaining to complete the work, the more difficult it would be for the Government to prove contract performance was endangered.

Plaintiffs make their "entire contract" argument convincingly because the contract's "time remaining for performance" is unknown; the contractors say it is nonexistent.  This is due to the nature of the A-12 contract – even beyond delivery of the Lot I production aircraft, the contract called for years of follow-on testing, aircraft maintenance, and contractor support on this major research and development effort.  Plaintiffs' position is sensible.  Research and development contracts typically lack clear indicia of contract completion.  Their schedule guidelines are flexible, as befits the open-ended projects normally controlled by research and development contracts; often no end date applies.  A witness for the Government testified,  "[u]ntil you get to the end [of the contract], you don't know what the last step is."

Plaintiffs' other argument is that the contract completion date was waived – or

---

[55] The "time remaining for contract performance" calls for a "contract completion date."  This phrase in particular creates much of the disagreement between plaintiffs and defendant.

[56] Answers to the first two questions are necessary predicates to the third; that is, whether the contracting officer acted reasonably in making his default decision.  Nature of the contract and length remaining for performance are needed to conduct a <u>Lisbon</u> test.

disestablished – when the Government let original first flight pass in June 1990 and reset only part of the delivery schedule through the P00046 modification.  P00046 included only revised delivery dates for the first eight aircraft and not the remaining contract milestones.  In other words, plaintiffs maintain the Navy lost its right to terminate them for default for failure to make progress because it waived the schedule to contract completion.

The Government offers a flexible approach to review of the contracting officer's decision. Defendant contends that this court need decide only whether the weight of the evidence shows the contracting officer reasonably felt insecure about the contract's timely completion.[57]  The contract contained a series of enforceable delivery dates, defendant points out; time was of the essence.  The Government could terminate plaintiffs for default if the contracting officer reasonably believed timely completion was uncertain.  Defendant argues that "entire contract effort" as used by the Circuit represents any convenient measure of the delivery dates.  This measure may be used to evaluate the contractors' progress at termination.

Defendant's argument assumes an important fact: the yardstick we use to measure plaintiffs' progress is not so important as having one.  That is, the "entire contract effort" need not include every segment of work contemplated by the contract, but may be any objective measure of the contractors' progress at termination.[58]  Defendant's reluctance to point to a completion date was apparent during post-remand proceedings.

---

[57] We infer from defendant's various offerings during oral arguments and in briefs that the Government realizes that a date for contract completion was not spelled out in the A-12 contract.  Dates of timely completion defendant has suggested range from first flight in December 1991, to TECHEVAL in April 1993, to CLIN 0058 in June 1996.  CLIN 0058 was the final line item chronologically.  Such suggestions are unconvincing for their shotgun effect, but defendant raised a plausible contention:  Whether we use TECHEVAL as a mark of "essential completion," or the close of CLIN 58 as the final completion date, "performance remaining under the contract" can be tied to a particular CLIN or a specific date among the CLINs.  This ruling is based on a series of dates that are tied to a particular CLIN, P00046.

[58] This analysis is similar to the approach we took in the last opinion, however.  A critical delivery date such as first flight might be considered a convenient yardstick against which to measure progress, as this was a key goal of all parties during early performance of the contract.  Nevertheless, the Federal Circuit made clear that "'the Government did not, as it urges, satisfy its burden by merely showing that the contractor[s] w[ere] behind schedule.'" McDonnell Douglas, 323 F.3d at 1014 (quoting Lisbon, 828 F.2d at 765).  Defendant's suggestion that we use a reasonable yardstick is attractive for its flexibility, but rulings of the Federal Circuit may call such a shortcut into question.

## B.  APPLYING LISBON

The A-12 contract contemplated a sophisticated research and development project designed to employ the United States' most sensitive technology.  Such a contract does not subject itself easily to existing case law from the contract boards.[59]  Lisbon was a construction case with an identifiable contract closing date.  See 828 F.2d at 761.  Assessing the contractor's progress at termination in Lisbon was a straightforward calculation using work accomplished, the work left to be done, and the time left to complete it.

The central issues important to an application of the Lisbon standard are work left to be completed and time remaining to complete it.  The parties do not agree on the meaning or significance of these potentially dispositive issues.  The Circuit did not suggest an appropriate legal standard to apply, or provide a legal basis for choosing among the competing arguments.  The court of appeals "le[ft] it to the trial court to determine on first instance the actual performance required by the contract and the amount of time remaining for that performance."  McDonnell Douglas, 323 F.3d at 1018.

An alternate means of resolving this case would be to choose a closing date offered by the Government.  Such dates could be CLIN 58, the latest of the suggested dates, or TECHEVAL, in April 1993.  The contractors make persuasive arguments that neither alternative date would be "final."  They would not cover the time needed and permitted by contract for plaintiffs to complete performance.[60]

Using CLIN 58 or TECHEVAL is artificial and arbitrary considering the failure to make progress clause.  The presumptive purpose of clauses allowing the Government to terminate a contract for failure to make progress is to enable an agency to end a project before the contractors miss a delivery or fail to complete a building on time.  The end date may be well

---

[59] The Circuit highlighted a board case in which a fraction was used to show the extent of a contractor's job performance.  See McDonnell Douglas, 323 F.3d at 1016 (reviewing courts may "compar[e] . . . the percentage of work completed and the amount of time remaining under the contract") (citing Thomas & Sons, Inc., ASBCA No. 51874, 01-1 BCA ¶ 31,166 (Nov. 13, 2000)).  The nature of this research and development contract is such that objective evidentiary helps like a percentage of completion are not available.

[60] One peculiarity of this alternative is plaintiffs' need to obtain the latest date for measuring performance possible, to give them more time in theory to build the A-12.  The latest date possible calls for plaintiffs to show maximum inefficiency in construction.  The contractors improve their legal position by contending that the Navy would have had the right, and presumably would have needed to, seek retesting and reconfiguration to achieve the plane it wanted.

before the contract's provision for delivery or completion.[61]

The Circuit commented that boards have applied the <u>Lisbon</u> test in default terminations for failure to make progress. <u>See id.</u> at 1016 n.2. These cases apply only by analogy because they are not failure to make progress cases involving research and development efforts. The reason for this may be that the Government rarely terminates fixed-price research and development contracts for default.[62]

The differences between the facts of <u>Lisbon</u> and of this case highlight the difficulties of interpretation. The <u>Lisbon</u> test creates problems of application when reviewing default terminations of contracts without completion dates. A case that redefined the required showing in default terminations for failure to make progress is <u>Universal Fiberglass</u>, 537 F.2d at 397. Though itself not a research and development case, <u>Universal Fiberglass</u> provides useful principles to guide the Federal Circuit's directions.

## C. <u>UNIVERSAL FIBERGLASS</u>

<u>Universal Fiberglass</u> considered a supply and service contract for more than 12,000 mail delivery trucks after government approval of a pilot model. <u>Id.</u> at 394. The Government warned the contractor repeatedly that failure to meet the delivery schedule would be grounds for termination of the contract. <u>Id.</u> The Government accepted Universal's model, but the contractor was unable to meet the first "benchmark" or milestone for delivery of production items. <u>Id.</u> The parties agreed to a ninety-day extension. <u>Id.</u> Following several additional extensions of time, none of which Universal met, the Government requested that the contractor submit a revised delivery schedule. The GSA Board made two rulings. First, it found that the government's request "impliedly waived plaintiff's failure to progress (so) as to endanger performance of the

---

[61] Early case law calling for a showing of impossibility or near-impossibility of performance, or abandonment, before allowing default for failure to make progress becomes more understandable in this light. Terminating a contractor months before the delivery date is appropriate if the contractor has abandoned the project or repudiated the contract; otherwise, termination can be harsh, inappropriate, and unexpected. <u>See, e.g.,</u> <u>Universal Fiberglass</u>, 537 F.2d at 398.

[62] Research has uncovered only two. <u>See</u> <u>Appeals of Flight Refueling, Inc.</u>, ASBCA Nos. 48503, 46846, 97-2 BCA ¶ 29,000 (May 22, 1997) (board found a valid default termination for failure to deliver two prototypes called for as end items on a development contract); <u>Appeals of ISC/Phonplex Corp. Instrument Sys. Corp.</u>, ASBCA Nos. 16668, 16772, 73-2 BCA ¶ 10,361 (Oct. 31, 1973) (board held a default termination invalid because the contracting officer had waived the delivery schedule). Neither is similar to this case factually.

contract" by asking for the new delivery schedule  Id. at 397.  The Board stated also that Universal's progress failures could not include those actions prior to the Government's request for the revised schedule.  Id.

On appeal, the United States Court of Claims reversed the board's conclusion with respect to the "failure to make progress implied waiver," stating, "[f]ailure to make progress is obviously something different from failure to deliver, or else the default clause would not provide separately for both."  Id. at 398.  The court found that the concept of waiver was inapplicable in failure to make progress cases:

> [T]he "cure notice" provision for "failure to make progress" terminations is obviously intended to supply the absence of a specific time marker to advise when the minute for default has been reached, such as exists when a contract delivery date has passed without delivery.  Thus to have prescribed a new delivery schedule also would have been supererogatory.  The "cure notice" served its purpose . . . the contracting officer [had not] learned, from the contractor or any other source, any information to lead him to believe that deliveries would or could ever be resumed.  In such circumstances, a unilateral delivery schedule prescribed by him would have been an exercise in futility . . . .

Id.

With respect to the second ruling, the Court of Claims noted that "[p]laintiff's actions, before [the Government's request for a new schedule], indicate a pattern of nonperformance and delay which should not be ignored.  Although not justifications for default in themselves, they provide a context for understanding and evaluating plaintiff's continued problems."  Id.

The Federal Circuit cited Universal Fiberglass with approval in the remand, which rejected the impossibility or abandonment requirement to sustain a default termination for failure to make progress.  See McDonnell Douglas, 323 F.3d at 1015 (Termination for default for failure to make progress affirmed "despite lack of express repudiation") (citing Universal Fiberglass, 537 F.2d at 398).  Universal also shows that an enforceable schedule is not necessary to determine whether performance is endangered in a failure to make progress case.

Universal holds that a schedule is not necessary because the cure notice supplants the schedule and serves a similar function.  The cure notice lets a contractor know that even if performance or delivery is not yet due, the contracting officer believes the contractor may not be making sufficient progress to complete the contract on time.  The burden is then on the contractor to advise the Government how it will complete the project on time, according to contract requirements.

The Government did not waive its right to terminate the contractors for default by not

52

reissuing a contract schedule for completion of the A-12.  Universal Fiberglass holds the Government may call time on a contractor for failing to make sufficient progress without having reissued such a schedule.  The Court of Claims' ruling eliminated the need for a schedule in a case such as this one, where the Government issued a notice to cure to alert plaintiffs to their deadline for making adequate assurances.  Universal Fiberglass showed that default for failure to make progress may be appropriate well before the work is to be completed even in the absence of such a schedule because of the cure notice.

Universal Fiberglass highlights the importance of differentiating between failure to make progress and failure to deliver.  In this case, plaintiffs were terminated for default nearly a year before performance was due.  The issues in this case are layered and subtle compared to those of Universal.[63]  Nevertheless, Universal suggests that the contractor defense of waiver as established in DeVito is inapplicable in this failure to make progress case.  Though the contract may have not had a clear completion date, plaintiffs remained bound by their contractual duty to make progress.

The default clause for failure to make progress does not make reference to a schedule, but allows termination where a contractor is failing to make progress or to prosecute the work "so as to endanger performance."  FAR 52.249-9.  The question becomes, how would the Government know reasonably whether contract performance was endangered without a contract schedule.  See McDonnell Douglas, 182 F.3d at 1332 ("Having determined that Contractors were obligated to make enough progress such that contract performance was not endangered, we must now address what progress Contractors should have made . . . .").  Similarly, how might this court "decide . . . the amount of time remaining for performance" to analyze whether the contracting officer had a reasonable belief there was no reasonable likelihood of timely completion.  McDonnell Douglas, 323 F.3d at 1017.

Establishing a new enforceable schedule might be the easiest means to determine whether performance has been endangered, but according to Universal a schedule is not a precondition to termination.  Nevertheless, the Government must have at least a "clear understanding of what needed to be done and how long it would reasonably take."  CJP Contractors v. United States, 45 Fed. Cl. 343, 378 (2001).  Use of this specified schedule of work and time is necessary to gauge the reasonableness of a termination for failure to make progress.  Once a court has defined

---

[63] The Universal court notes that "[p]laintiff was making no progress at all, had never manufactured a vehicle under the new specifications it had agreed to, did not have the necessary parts and could not obtain them and had allowed its labor force to wither away." Universal Fiberglass, 537 F.2d at 398.  Moreover, the Government had already asked plaintiff for a new schedule and had been rebuffed.  "If this situation is not what this failure to make progress clause is about . . . we are at a loss to understand why it was put in the contract at all."  Id.

these parameters, it may measure the contractors' progress in light of factors probative of plaintiffs' ability and willingness to perform.

## D.  THE YARDSTICK

The Federal Circuit implied in this case that a court may choose a reasonable period of performance to use as a measure of progress on the contract.  See McDonnell Douglas, 182 F.3d at 1332 ("In litigation over a contractor's failure to make progress – unlike a dispute over failure to meet a specific contract requirement or schedule – courts must always determine ex post the threshold of performance that a contractor must meet to avoid endangering performance.") (citing Cibinic & Nash, Administration of Government Contracts 930-32).  The phrase cited by the Federal Circuit in 1999,"courts must always determine ex post the threshold of performance that a contractor must meet to avoid endangering performance," suggests discretion in the trial court to define a yardstick that fairly measures the contractor's performance in the circumstances. The current remand order more clearly allows this: "[W]e leave it to the trial court to determine on first instance the actual performance required by the contract and the amount of time remaining for that performance."  McDonnell Douglas, 323 F.3d at 1018.

The Federal Circuit ruled in 1999 that "[i]n the A-12 case . . . there was a specified delivery schedule, including the delivery of the first FSED aircraft in December 1991." McDonnell Douglas, 182 F.3d at 1332 (citing the record for the original schedule for the eight FSED aircraft and the revised delivery schedule for the same).  The Circuit then noted that the A-12 contract "[t]herefore . . . imposed a duty on contractors to make such progress so as not to endanger performance . . . ."  Id.  The court of appeals held that "the contract, throughout its term, embodied a duty to make progress toward the ultimate end item" even though at termination the contract did not "embody[] the ultimate end item."  Id.

The "actual performance required by the contract and the amount of time remaining for that performance" at termination may be a measure such as the yardstick discussed here.  The Federal Circuit opened the door to P00046 or an alternative contract schedule for that purpose. It meets the Circuit's requirement that the court "decide the actual performance that the contract requires and the amount of time remaining for performance,"  McDonnell Douglas, 323 F.3d at 1016 (citation omitted), in absence of the ultimate contract closing date.  The P00046 yardstick uses a contract period before the ultimate completion date for measuring performance, but one that encompasses more data for evaluation than a mere milestone.  P00046 comprises a series of milestones, each with its own date due and its own standards of completion.  The yardstick shows the contractors were behind schedule at termination according to a self-contained series of milestones, not in relation to the entire contract.

The P00046 schedule contained benchmarks for performance and delivery dates that were enforceable and explicit at termination.  See McDonnell Douglas, 323 F.3d at 1019 ("Based on the information available at the time, the government's unilateral schedule was reasonable.").

One benefit of P00046 is that aircraft number eight has a definite date for delivery, not encumbered by a "sliding scale" of time resulting from references to other dates for calculation. For the purposes of measurement, this schedule represents the "entire contract effort."

The parties recognized before termination that the schedule against which the contractors were attempting to make progress was the P00046 delivery schedule.  The Navy's purpose in issuing the partial contract modification was to allow the contractors to continue performing under the FSED contract despite their non-delivery on the first flight deadline in June 1990.  Lot I was not a realistic concern for the Government during the months leading to termination.  The Navy believed contract dates would be restructured eventually, or the contract would be cancelled.  According to Captain Elberfeld, the Navy had "no Schedule for the Lot I aircraft that you would call a realistic schedule."[64]  We use FSED aircraft numbers one through eight because realistically, they represent the performance "in play" at termination.[65]

The severable nature of the A-12 contract assists the analysis.  That is, the FSED portion of the contract was treated by the parties differently from the production phase, as separate contracts.  The Lot I phase was added when the Navy exercised its first production option.  Other contractors could have produced hundreds of A-12 aircraft once General Dynamics and McDonnell Douglas completed the research and development phase.[66]  Also, the A-12 contract applied different FAR provisions to the FSED and production phases.

_____

[64] We do not reach the issue of whether the contractors could have been terminated for failure to make progress toward their Lot I obligations under the contract.  Captain Elberfeld and the contractors point out that if all of the contract dates were in effect and enforceable simultaneously, the result would have been a nonsensical, overlapping schedule against which plaintiff could not realistically perform.  It would have been impossible for the contractors to deliver Lot I aircraft on the dates the parties originally intended.

[65] Captain Elberfeld testified in 2001:

The schedule for – completing contracts is something that takes sometimes years.  Some contracts [take] 10, 15 years before they're closed out, even after the last aircraft is delivered.  So asking the schedule to close out contracts is – I don't know what the schedule is to close out the contracts.  We had schedules for delivering aircraft, we had schedules for other milestones, like critical design review, preliminary design review, on the major program milestones.  But I don't recall the contract saying and the contract will be completed and closed out on this date, as one of the requirements of the contract.

[66] The Navy asked bidders to form teams partly so the winning contractors could compete against each other for future production contracts.

The separate FAR default clauses applied to each are significant for our purposes.  FAR 52.249-9 authorizing termination for failure to make progress – the provision interpreted by Lisbon – applied only to FSED work under the contract.  The Production Lots were to be governed by FAR 49.249-8.

P00046 provides an appropriate and "relevant" time period the court may use to consider whether the contracting officer could reasonably have been insecure about the contractors' rate of progress.  In the Federal Circuit's terms, this permits the court to "determine[] the performance required by the contract and the contract completion date . . . ."  McDonnell Douglas at 1018.

Having determined P00046 defines "the performance required by the contract" and the time remaining for contract performance," the next step is to "decide, in light of the information upon which the contracting officer relied" whether he had a reasonable belief that plaintiffs would not perform.  Id.  That is, whether he was "right," objectively.[67]  As the court of appeals noted, "this is a determination . . . on which [the Circuit] neither express[es] nor intimate[s] any view.  Id. at 1018.

We "must take into account all of the relevant facts and testimony" in deciding whether default termination was justified.  Id. at 1013 (emphasis added); see also id. at 1017 ("The government owes the contractor no less than an assessment of all of the relevant circumstances when it exercises its discretion under the default clause.") (citing Appeal of L & H Constr. Co., ASBCA No. 43,833, 97-1 BCA ¶ 28,766 (Feb. 5, 1997).  "In determining whether a default termination was justified, [trial] court[s] must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues."  Id. at 1014.

## E.  RELEVANT FACTS AND TESTIMONY

"'[R]elevant facts and testimony' include Contractors' statements that they could not meet the contract specifications, the contract delivery schedule, nor complete performance at the specified contract price."[68]  Id. at 1013.  We also consider other "tangible, direct evidence

---

[67] The law does not necessarily require that Admiral Morris or any contracting officer be right.  The issue is whether "the Government" had in its possession sufficient information that would have justified the contracting officer's nominal concern had it been known.  See infra note 69.

[68] The Federal Circuit included these items in the remand order, knowing that they were the primary criticisms against plaintiffs on appeal.  Id. at 1013.  The Circuit's choice of these alleged shortcomings seemed to equate plaintiffs' failure to meet the schedule, their

reflecting the impairment of timely completion" in deciding whether the contracting officer acted reasonably, id. at 1016, including:

> [T]he contracting officer's testimony and contemporaneous documents. Id. at 1016 (citing Lisbon, 828 F.2d at 766);

> [T]he contractor's failure to meet progress milestones. Id. at 1017 (citing James E. Kennedy, Jr. v. United States, 164 Ct. Cl. 507, 512 (1964); Appeals of AAR Corp., ASBCA Nos. 16486, 16992, 74-2 BCA ¶ 10,653 (Apr. 24, 1974));

> [T]he contractor's financial situation. Id. (citing Universal Fiberglass, 537 F.2d at 395-96); and

> [T]he over-all evidence of [the contractors'] failure to prosecute diligently [their] work under the contract. Id. (quoting Discount, 554 F.2d at 441).

### 1.  Contractors' Statements

"Contractors' statements that they could not meet the contract specifications, the contract delivery schedule, nor complete performance at the specified contract price" are relevant to deciding whether the termination for default was justified. McDonnell Douglas, 323 F.3d at 1016; McDonnell Douglas, 182 F.3d at 1332. The trial record supplies reasons that a contracting officer might have deemed himself insecure if he were considering the period of performance identified as the "yardstick." For example, plaintiffs' internal schedules showed they would not complete the prototypes covered by P00046 by February 1993. Mr. Anders, General Dynamics' CEO, commented in response to a question from Under Secretary Yockey that the plane would not "fly by 2 January [1991]. All deficiencies cannot be corrected. Can we deliver a satisfactory aircraft for the Navy? Mother Nature won't allow correction of all defects."

McDonnell Douglas' CEO, John McDonnell, said in the same meeting that the contract "has got to get reformed to a cost-type contract or we cannot do it. We need some form of Public Law 85-804." (emphasis added). Mr. Lamers, General Dynamics' Program Manager during most of contract performance, agreed that restructure would be necessary.

Six months prior to termination, the contractors projected a twelve to fourteen-month delay in first flight [June – August 1991]. By termination, the contractors' expectations extended first flight to March 1992. TECHEVAL would be in July 1995. Plaintiffs could not meet their own schedule, or their representations regarding schedule. This fact is relevant to the issue of

---

requests for more money, and their problems with some specifications, with legitimate bases for termination.

whether the contracting officer could have been concerned whether plaintiffs were making sufficient progress.

Neither contractor would commit to a bilateral schedule without first reaching agreement with the Government regarding outstanding "technical and business" issues. The parties were negotiating solutions to severe schedule slippage at termination. CEO Anders conceded plaintiffs would "do the best we can, and the Navy has to decide if that's good enough." General Dynamics' chief executive officer Pace said the contractors had "major financial problems." To support their request for an equitable restructuring of the contract, Mr. Pace sought to remove "financial strains upon the contractors that might prevent achievement of technical resolution." The parties' A-12 program manager, John Lamers acknowledged that "[s]ome kind of restructure would have to be accomplished if we were to get that aircraft into the fleet."

The contractors' admissions of inability to complete the work according to the P00046 schedule, alleged impossibility of satisfying the design requirements, and concerns about the business issues do not alone satisfy the Government's obligation to prove default. McDonnell Douglas, 323 F.3d at 1015. Such admissions may be sufficient in combination with other factors, however, to show that the contracting officer might reasonably have felt insecure. See id. at 1016-17; McDonnell Douglas, 182 F.3d at 1328 ("The cost to complete a contract - more particularly, the inability of a contractor to perform a contract at the specified contract price are both fundamental elements of government contracts and are related to contract performance; as such, they are highly relevant to the question of default."). Among the other factors are the contracting officer's testimony and contemporaneous documents.

### 2. Contracting Officer's Testimony

"The Contracting Officer's testimony and contemporaneous documents are relevant" when deciding whether the default termination was justified. McDonnell Douglas, 323 F.3d at 1016.[69] The termination notice to the contractors stated that termination was "based on the

---

[69] The role of the contracting officer in deciding to terminate for default was another issue. The contractors contend the Government cannot sustain its burden because the contracting officer did not perform a Lisbon analysis, citing the Federal Circuit's remand order:

> Unless the contracting officer had determined the entire effort required under the contract and the time left to complete the contract, it would be difficult, if not impossible, for him to resolve whether there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for performance.

Team's inability to complete the design, development, fabrication, assembly and test of the A-12 aircraft within the contract schedule and the Team's inability to deliver an aircraft that meets contract requirements." Testimony by Morris at trial supports these conclusions.

Admiral Morris expressed some reservations about contract completion during his testimony at the 1993 and 2001 trials. As the end of 1990 approached,[70] he was concerned that substantial development on the aircraft had yet to occur. He testified "[t]he contractors were indicating that they were experiencing an overrun that they could not absorb. Cost was

McDonnell Douglas, 323 F.3d at 1017 (internal quotation marks and citation omitted).

This statement is unclear in context. It does appear to lend support for the contractors' contention. The statement is not easily reconciled with the requirement that this court conduct a de novo review of the contracting officer's default termination decision. Id. at 1018 n.3. Factual findings show that Admiral Morris did not calculate a percentage of completion or consider all the circumstances.

The contractor in Empire Energy v. Roche argued that McDonnell Douglas adopted a special rule for terminations for failure to make progress that departed from the objective analysis requirement. 362 F.3d at 1357. The contractor claimed that "the contracting officer could not properly have terminated for failure to make progress because she [the CO] did not specifically consider whether [the contractor] could have completed the project within the period of excusable delay." Id. The Circuit reasoned:

> We have expressly held that the government must show in termination for failure to make progress cases that it was reasonable for the [government] to conclude that [the contractor] would be unable to complete the project by what the [reviewing court or] Board found to be the proper completion date. . . . McDonnell Douglas is not to the contrary. Indeed, McDonnell Douglas demands an objective inquiry, not an evaluation of the contracting officer's subjective beliefs. . . . It requires the court to consider whether the contracting officer's decision to terminate for failure to make progress was reasonable given the events that occurred before the termination decision was made.

Id. at 1357-58 (internal citations and quotation marks omitted). The court did not discuss further the excerpt cited above, but Empire clarifies the fact that Admiral Morris did not perform a Lisbon analysis is not dispositive.

[70] Admiral Morris testified that concerns about the A-12 Program "started arising very rapidly . . . . Those concerns increased, [he] belie[ved] the risks increased, as we got into the Fall of 1990."

59

obviously a factor and their failure to fabricate components, their failure to meet schedule were clearly impacting cost."

Admiral Morris explained that the contractors' "failure to fabricate parts was endangering performance because . . . I didn't know at that particular time when in fact they would be able, if ever, to achieve [performance of the contract] . . . and I was hearing 'we will not' or 'we could not' . . ." Admiral Morris did not know when the contractors would finish, he said, if ever. However, he did not calculate the contractors' percentage of completion or consider the FAR factors prior to termination. See supra notes 42-44 and accompanying text.

The contracting officer testified that in the weeks leading to termination, the contractors

acknowledged they would not be able to achieve the contract specifications and the contract requirements. . . . [T]hey indicated that they would not be able to meet the delivery schedule that was currently in the contract. And . . . they would not be able to perform the contract without extraordinary relief or additional funding for the contract.

Admiral Morris thought the contractors had not provided him sufficient information about cost or schedule. He quoted the contractors as informing him, in his words, "I don't know what I can provide, when I can provide it, and I can't tell you how much it's going to cost." The contracting officer summarized, "they basically said they can't perform under the contract and they were in default of it."

Admiral Morris did not commit such concerns to writing as they arose.[71] He encouraged the contractors to continue performing in the face of their alleged default.[72] Admiral Morris did

---

[71] Comments to plaintiffs from the contracting officer who preceded Admiral Morris, Mr. Michael Mutty, were an exception. Mutty wrote a letter to the contractors on July 12, 1990, after they did not delivery first flight on time. The letter stated they "failed to deliver the first aircraft as required by the contract. This failure could jeopardize performance of the entire FSED effort." See infra p. 68.

[72] Earlier factual findings by this court establish that Admiral Morris did not determine the entire effort required and the time left to complete that contract effort prior to termination. See, e.g., 35 Fed. Cl. at 364 n.6 ("[Admiral Morris] did not know the details of contract performance or the details of the contract specifications."); id. at 367-68 ("Morris did not review any A-12 contract documents in preparation for the termination. . . . He did not review documents related to schedule or specifications."); id. at 368 ("Admiral Morris testified at trial . . . [that] under [Yockey's] guidelines, [he] couldn't do the one thing that [he] wanted to do, . . . and that was continue the contract. . . ."); see also supra note 40. An

not think the contractors' inability to complete performance on time was fatal to the contract, or to the Program.  He wanted a finished product when he could get it.[73]

The Government cites the termination memorandum as a "contemporaneous memorialization" of Admiral Morris' belief that the contractors were in default at termination. A termination memorandum is an in-house document that provides evidence of the contracting officer's reasoning for the decision to terminate.  We disregarded the memorandum as evidence of the truth of its contents because of the circumstances surrounding its creation.  For example, the Government maintains that the memorandum highlighted the "importance of [the contractors' purported two-year] delay" as a basis to terminate for default.  The termination memorandum states in the conclusion, "[a]s a consequence of the team's delay, the Navy would be required to purchase production aircraft before verifying that the aircraft are operationally suitable and effective."  Defendant cited this as support for its argument that the contracting officer's termination for default was reasonable.  Admiral Morris did not reach such a conclusion regarding a two-year delay.  Testimony during trial about a two-year delay apparently was meant to coincide with and offer support for the termination memorandum, though its source was an unrelated, land-based aircraft that Lockheed had attempted to build.[74]

Admiral Morris did not testify that he made such a determination or had such a concern. Indeed, he could not have.  The A-12 contract schedule obligated the Navy to exercise its options to purchase the production lots before completion of the testing phases irrespective of contractor delay.  Eleanor Spector testified that this element of the contract schedule was a risk known before contract award, not "a consequence of the team's delay."  The Navy had exercised the option to order six production aircraft, Lot I, in May 1990, before the original first flight deadline

---

analysis of Admiral Morris' testimony next to his conduct at the time shows that Admiral Morris was not concerned about the contractors' impairment of timely completion, but only wanted an eventual product for the Fleet.

[73] Admiral Morris was among the A-12's most enthusiastic cheerleaders before he was directed to terminate the contract, and after.  Admiral Morris' testimony suggests that he worried about whether the contractors would complete the A-12 project.  At termination, however, he was not particularly concerned about deficiencies such as failure to meet the delivery schedule; he did not think they were fatal to the A-12 Program.  Admiral Morris' conduct throughout contract performance shows that he acknowledged the risk and the problems with performance, but he continued to encourage the contractors.  See McDonnell Douglas, 35 Fed. Cl. at 366-67.

[74] The language quoted in the termination memorandum was taken from a termination memorandum used for another project, the P-7.  Ms. Olsen had little time to craft a memorandum specific to the A-12 that busy Monday morning, January 7, 1991; this was the day the Government's half-billion dollar advance to plaintiffs was due.  See supra pp. 38-39.

the following month.

The only section of the A-12 termination memorandum that addressed the program's schedule "stops short of a prediction."  McDonnell Douglas, 35 Fed. Cl. at 367 n.12.  Ms. Olsen and Admiral Morris neglected to fill in the blank provided by the P-7 memorandum: "Since June 1990, the team has consistently reported its delays; and the Navy's independent review confirmed that, given the state of the team's development efforts, delivery of aircraft and completion of related contract requirements could occur no sooner than _____." [sic]  This confirms that Admiral Morris did not conduct an analysis of the time it would likely take the contractors to complete the entire effort.  Asked about this key omission during trial, Admiral Morris admitted, "obviously I blew it."

Admiral Morris wanted the opportunity to resolve the issues without extraordinary relief. At trial, he agreed that the contractors were in default and he testified he thought they should be terminated for default.  The Federal Circuit interpreted this testimony as evidence plaintiffs were seriously in default at termination.  See McDonnell Douglas, 182 F.3d at 1327 ("[T]he trial court's finding that the Navy went to great lengths to preserve the A-12 program suggests that it would not have terminated the contract but for its belief that Contractors had breached the contract or would not perform the contract.").[75]

The contracting officer's testimony and contemporaneous documents do not provide sufficient evidence to prove justifiable termination for default.  Admiral Morris' beliefs are not conclusive, however, but only a factor to consider upon review.  See McDonnell Douglas, 323 F.3d at 1016 (holding "a court's review of default justification does not turn on the contracting officer's subjective beliefs but rather requires an objective inquiry.").  "[We] may also consider other factors usually relied upon by courts and contract boards, such as . . . . the contractor's failure to meet progress milestones."  Id.

### 3.  Failure to Meet Milestones

The Federal Circuit ruled that concern about plaintiffs' missing a milestone is not a

---

[75] Admiral Morris did not want to terminate the contract; he wanted the opportunity to continue despite the concern he expressed at trial that plaintiffs were in default.  He would have attempted to work with the contractors even without a "bail-out" or other relief.  Given his testimony during trial and contemporaneous records, the Government's insistence that he believed the contractors were seriously in default at termination seemed to put Admiral Morris in an odd position.  The Circuit noted, however, that the Navy's and Admiral Morris' desire to continue the contract "does not thereby waive [the Government's] right to terminate for default."  McDonnell Douglas, 182 F.3d at 1327.

proper basis for termination. Id. at 1015 (citing Lisbon, 828 F.2d at 765). However, missed milestones may be considered in conjunction with other contractor shortcomings in determining whether the contracting officer made a reasonable decision to terminate for default. Id. at 1016-17.

The contractors did not deliver the June 1990 first flight on time according to the original schedule. They would not have delivered first flight on the revised schedule either. Missing a milestone could cause delay in the "building block" sequence of construction, irrespective of findings that the contractors were using their best efforts to improve and advance the project. Defendant points out that the contractors had missed several milestones by termination in December 1990-January 1991. CDR was scheduled to be completed by July 1989 (CLIN 0003). In 1989, the CDR was divided into a four-phase process. The third phase was still open at termination, and the fourth would not be completed until July 1991.

The contractors missed delivery of two prototypes before the Navy issued P00046, the modified contract schedule. The contractors admitted they would not meet various milestones in the future. Plaintiffs claim that no missed milestones were outstanding as of termination because first flight and the CDR milestones were waived through contract modifications. They contend that missed milestones have no legal significance in any event, because the contract had no binding completion date.[76]

The Navy did not terminate the contract when it became apparent CDR would not be completed on time; nor did it terminate when plaintiffs missed the original first flight date. Missed milestones do not necessarily give the Navy such authority. See Ubique, Ltd., DOTCAB Nos. 71-28, 71-28A, 72-1 BCA ¶ 9,340 (Feb. 16, 1972) (Where the date contractor was due to present prototype for government inspection passed without delivery, "the Government could not have summarily terminated [contractor] for default").[77] Missed milestone dates may, however, be relevant. See Universal Fiberglass, 537 F.2d at 397 (Missed milestones "indicate a pattern of nonperformance and delay which should not be ignored. Although not justifications for default in themselves, they provide a context for understanding and evaluating plaintiff's continued problems"). Such information should be relevant if we consider whether a reasonable contracting officer might reasonably have been concerned about plaintiffs' ability to complete the contract on time.

---

[76] This is one indication of the importance of their interpretation of the remand order to the contractors; it has wide implications.

[77] Perhaps the Government could not have terminated the contractors for failure to perform the work under the contract within the time specified, or any extension, see FAR 52.249-9(a)(1)(i), but not for an alleged progress failure that requires proof of "endanger[ed] performance." FAR 52.249-9(a)(1)(ii).

#### 4. The Contractors' Financial Situation

The contractors' financial situation, "particularly, the inability of a contractor to perform a contract at the specified contract price" is relevant to the question of default. McDonnell Douglas, 323 F.3d at 1017; McDonnell Douglas, 182 F.3d at 1328. We ruled in 2001 that "[n]either the cure notice nor the default notice suggests that the Navy thought the contractors were financially unable to complete the contract" and that "plaintiffs' financial condition was not endangering performance of the A-12 contract." McDonnell Douglas, 50 Fed. Cl. at 320-21. The Government did not terminate plaintiffs for default on that basis. Id. Notwithstanding these conclusions, we may consider the contractors' financial situation as part of the over-all reasonableness inquiry mandated by the appeals court.[78]

Government officials close to the contract, including the Secretary of Defense, believed P.L. 85-804 was necessary to go forward with the A-12. This would permit a contract restructure or a "bailout," if needed. Morris did not close the door to negotiating a new contract without it, but he became more pessimistic after the notice to cure. He encouraged plaintiffs to address the cost overrun situation in response to the notice. He felt cost was a "real issue." Ms. Spector's testimony showed she agreed with Admiral Morris: "[W]hen a contractor has financial problems it's unable to do work-arounds. It's unable to do new technical approaches that may be necessary to solve a problem."

The contractors' requests for restructure of the A-12 contract are relevant too. The contractors expressed to the Navy in the Summer of 1990 and several times later that Fall their belief that insufficient funds were obligated to perform. Mr. McDonnell lamented: "The fixed-price nature of the contract precluded good management." He claimed that the A-12 contract "has got to get reformed to a cost-type contract or we cannot do it."

The Government did not terminate for default because of plaintiffs' cash flow problems. McDonnell Douglas, 50 Fed. Cl. at 320-21. Admiral Morris acknowledged he was not in a position to make decisions about contractors' financial position. Id. The contractors' requests to restructure the contract were not declarations of financial inability or unwillingness to perform. Id. However, evidence regarding how perceived financial problems may affect performance on the contract, such as statements by Admiral Morris, Ms. Spector, and Mr.

---

[78] The Federal Circuit discussed the issue of financial ability in the remand after acknowledging that this court "declined to base its determination of justified default on Contractors' alleged financial inability to perform the contract." McDonnell Douglas, 323 F.3d at 1011. It is unlikely the appeals court would have directed consideration of plaintiffs' financial ability if that factor could not be a part of the "tangible, direct evidence" to which we should refer on remand.

McDonnell, are "highly relevant to the question of default." McDonnell Douglas, 182 F.3d at 1328. Representations of the contractors' grave financial position from parties close to the contract in the months prior to termination, support a finding of justifiable default measured by the P00046 schedule.

5. The Contractors' Failure to Prosecute

We may consider "over-all evidence of [the contractors'] failure to prosecute diligently its work under the contract." McDonnell Douglas, 323 F.3d at 1017 (quoting Discount, 554 F.2d at 441). This category goes to the merits of plaintiffs' performance, and it serves as a summary of matters discussed earlier.

The contractors' history of performance in general can be said to have involved delays and unresolved issues. Plaintiffs experienced a number of delays and problems with technical issues throughout contract performance.[79] Admiral Lockard emphasized that plaintiffs were having serious difficulties manufacturing aircraft parts. Contractors admitted after the June 1990 first flight date passed without delivery that they were experiencing a twelve to fourteen-month delay. TECHEVAL was scheduled to occur at least eighteen months after the April 1993 date in the original contract. The contractors acknowledged that all delivery dates in the Master Program Schedule would be delayed.[80] The contractors had not delivered two aircraft on time when the Navy unilaterally modified the delivery schedule in August 1990.

Despite delays, the contractors continued operations. They were spending $120 to $150 million of their own money every month. They were committed to performing the A-12 contract until the date of termination. The contractors were encouraged to spend their own money in part by the Navy's A-12 Program Review that found "[n]o major 'showstopper' technical issues." At termination, the Navy noted "a modest uncertainty in first flight date," but also asserted that "system performance is good with excellent overall operational capability." The Navy acknowledged contractor delays but encouraged the contractors to continue. The Navy elected to go forward during the Design Review Boards with knowledge that the A-12 aircraft would not meet all specifications in the original contract. The contractors' strict conformance with each specification was not a principal concern of the Government's then. Some specifications were

---

[79] The nature of research and development contracts is such that most of the work normally happens during earlier periods of performance than is typical of construction or delivery contracts.

[80] This evidence shows that the contractors recognized performance problems during development of the A-12. The Master Program Schedule, however, has little meaning otherwise, because it includes only the original contract dates. These were not enforceable at termination.

65

"chinning bars," set high to insure that the Navy would get the best aircraft possible.[81]

Plaintiffs did not intend to abandon the project, though a showing of abandonment is not necessary to establish failure to make progress.  See McDonnell Douglas, 323 F.3d at 1015.  Mr. McDonnell testified that "[t]he U.S. Navy was our biggest and most important customer.  This was the program of the future for the U.S. Navy. . . .  And so the biggest program for the longest future and our biggest customer, you don't stop performing on something like that."[82]

The test for reviewing the contracting officer's decision does not, however, include solely the effort expended by the contractors in attempting to meet the contract requirements.  This court explained in a recent failure to make progress case that "[i]f that was our ultimate goal, the court would simply state that the record evidence establishes that [the contractors] worked very hard on the contract. . . . [Assessing whether the contractor failed to diligently prosecute the work] requires that we look at the results of the contractor's efforts . . . ."  Aptus Co. v. United States, 61 Fed. Cl. 638, 657-58 (2004), aff'd sub nom. Lin v. United States, 159 Fed. Appx. 186 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 1921 (2006).

Government officials decided uncertainty regarding schedule and cost was causing problems with continuing the Program.  That is, the contractors' efforts were not "good enough."  Government witnesses testified they believed plaintiffs were operating woefully behind schedule, and evidence supports their concern.

Admiral Lockard reported to Secretary Cann in September and November 1990 that he thought the contractors' progress was unsatisfactory.  He testified about a "lingering technical concern" that first flight would be difficult to predict in early November 1990.  He could not predict with accuracy when the first plane would fly until all the composite parts were successfully built, and getting those parts built created continuing difficulties.  After a meeting of the Design Review Board for the third phase of CDR, he felt "hopeful" that he could declare CDR a success and approve the A-12 design.  He concluded "it was going to take a considerable amount of time for [the contractors] to figure out the problems that they were having [building

---

[81] The Navy may have been unsure what to include as performance specifications in the A-12 contract at the outset.  This would be understandable, as no one had designed a stealth fighter that would land on an aircraft carrier.

[82] Trial notes confirm that this testimony, which otherwise may strike a finder of fact as self-serving, was entirely credible.  Mr. McDonnell's testimony was honest and truthful with respect to his intentions and those of his company.  Admiral Morris' contemporaneous impression of a January 1991 meeting with the CEOs was, "[b]oth companies committed."  At the same meeting, he noted Under Secretary Yockey's agreement that the contractors were "mov[ing] in the right direction."

composite parts repeatedly,] then correct everything to make it work."

Admiral Lockard explained:  "I couldn't give my boss or anyone else a date we felt with certainty that we could stand up and say, they will be ready on this date."[83]  Captain Elberfeld, Admiral Cook, Admiral Lockard, and Secretary Cheney all thought the contractors were in material breach.

Captain Elberfeld was concerned about the contractors' acknowledgment, beginning in Spring 1990, that they would be at or over the ceiling price.  He thought this jeopardized the contractors' performance.  The contractors' cash flow problems led to "cost cutting efforts like reducing staff, eliminating overtime, quick fixes that address and would remedy a cash flow situation."  Captain Elberfeld learned in July 1990 that this meant removing 110 people from the A-12 program, which would result in more schedule problems.  He said, it would cause "a longer process to get product that may not be the product that we desire or need."

Admiral Cook succeeded Captain Elberfeld as the A-12 Program Manager prior to termination.  Admiral Cook had been "convinced . . . [that] the program was not executable" by the first of the CDR Phases.  Like Admiral Morris, he wanted a chance to continue building the A-12 because he thought it was "needed [for the Fleet]."  However, he thought that a "bailout" was necessary for the contractors to be able to continue performing under the contract.

The concern among Navy officials throughout 1990 was first flight.  They all knew the contractors would not meet the first flight milestones in June 1990 and December 1991, but it remained a troublesome issue because of the importance attached to this significant milestone.  The following comments are taken from weeks of testimony and from a voluminous documentary record.  They are necessarily selective, but they provide a flavor of the concerns that constitute evidence the Circuit discussed:

Admiral Cook: The Navy would not "get eight FSED aircraft or anything of use . . . without a bailout . . . . Period."

Admiral Lockard:  Successful outcomes pursuant to the agreements reached at CDR were contingent upon resolution of outstanding business issues.  Admiral Lockard testified that the contractors' failure make progress on the structural components – i.e., "big bones," – was critical to the contract.  He found that "[the contractors] were not making progress in building [the planes] . . . they were severely behind . . . and we couldn't assemble the first airplane until they

---

[83] Admiral Lockard was the Chief Engineer of NAVAIR.  He met with Admiral Morris near the end to discuss "the technical issues, could we get them resolved, if we could find a way to satisfy the business arrangements, to get the contractors to do the work. . . . We were unsuccessful in finding a way to get the contractors to do the work."

were able to build these parts successfully." Admiral Lockard acknowledged that the contractor's difficulties in manufacturing parts did not suggest that "they could never build the parts; I just thought that it was going to take a considerable amount of time for them to figure out the problems" and correct them. He believed the contractors could complete the contract, but that it would take longer than anticipated.

Admiral Morris was aware of Admiral Lockard's statement, "technical resolution on the airplane has been reached." He knew of Admiral Lockard's belief that the parties "were on the way to a satisfactory CDR conclusion [and] [t]he contingencies on the RFA close-outs are vital to the success of the program." Admiral Lockard also notified Admiral Morris that the contractors had not complied with the "contingencies," however. Secretary Cann, whom Admiral Lockard briefed regarding this noncompliance, responded that he was concerned about the contractors' management structure.

Captain Elberfeld: The contractors stated they would be "unthinkably" over the A-12 contract fixed-price ceiling; their internal "worst case estimate could bankrupt both corporations." The contractors' cost-cutting efforts to avoid bankruptcy "lead to more corner-cutting and more incomplete effort and basically a longer process to get a product that may not be the product that we desire or need for the Navy."

Eleanor Spector: The contractors were spending $120 to $150 million per month. Their next progress payment would be August 1991, and they could not sustain a negative cash flow, "particularly considering the drains on the programs." Public Law 85-804 was the only way to go forward; absent restructuring, the Navy would never receive a usable aircraft.

Michael Mutty, the contracting officer of the Naval Air Systems Command, testified that the contractors were not meeting their requirements under the A-12 contract. On July 12, 1990, Mutty sent a letter to the contractors expressing

> serious concern regarding [the contractors'] performance under the A-12 contract. . . . [Y]ou failed to deliver the first aircraft as required by the contract. This failure could jeopardize performance of the entire FSED effort. Neither in your letter nor afterward have you provided any basis on which I could conclude that any of your obligations under the contract should be excused.

This letter gave the contractors notice of the Navy's concern over their lack of progress, their failure to meet contract requirements, and their possible termination. If Admiral Morris did not communicate his unease over A-12 to plaintiffs, or commit it to writing, Mutty did. He conveyed to the contractors "serious concern" regarding timely contract completion.

The issue on remand is whether a reasonable contracting officer, basing his termination decision on tangible, direct evidence reflecting the impairment of timely completion, could

68

reasonably have decided to terminate the contract for default. The Circuit described factors to consider in answering this question. These include the contracting officer's testimony and contemporaneous documents, the contractors' failure to meet progress milestones, the contractors' financial condition, and other pertinent circumstances surrounding the termination decision.

This Opinion includes mitigating factors for plaintiffs in the discussion above and throughout the Opinion, in an effort to give a true picture of the issues a finder of fact faces in this case. Additional such factors are explained below. Overall, however, evidence of record supports a conclusion that the Government was justified in terminating the contract for default for failure to make progress.

## III. CONTRACTORS' DEFENSES

The Government found no reasonable likelihood that McDonnell Douglas and General Dynamics would complete their contract obligations within the specified contract time. The default termination must stand unless the contractors prove the default was unlawful or excused. The contractors have the burden of proving such defenses. RFI Shield-Rooms, ASBCA Nos. 17374, 17991, 77-2 BCA ¶ 12,714 (Aug. 11, 1977).

The contractors assert three interrelated defenses: (1) the Navy waived the A-12 contract delivery schedule; (2) if the original schedule was not waived, the P00046 modification created a nonsensical overlapping schedule to which the contractors could not be bound; and (3) the contract had no completion date for the "entire contract effort" at termination, leaving no possibility the contracting officer reasonably concluded the contractors would not complete the work on time. These are intertwined with plaintiffs' arguments that the Government could not meet its burden under Lisbon.

### A. WAIVER OF DELIVERY SCHEDULE

Plaintiffs maintain that defendant waived or "disestablished" the original schedule to completion when it allowed the contractors to continue working beyond the June 1990 delivery date, and reset only a part of the work required under the original contract. They cite the remand to support this contention. See McDonnell Douglas, 323 F.3d at 1019 (discussing DeVito, 413 F.2d at 1154-55). DeVito held that

> [w]here the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given. This is popularly if inaccurately referred to as a "waiver" of the right to terminate . . . . The necessary elements of an election by the non-defaulting party

69

to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

413 F.2d at 1153-54.

Plaintiffs assert that the Government waived all dates in the original schedule by encouraging the contractors to continue work after they missed the June 1990 first flight deadline, and that the Government must reset the entire schedule in such circumstances to re-establish time of the essence.

Defendant's position is that DeVito addresses the Government's burden to reestablish missed delivery dates, but it does not require the Navy to reestablish dates that have not yet come to pass.  It argues,

[n]othing in the law forced the Navy to decide on July 1, 1990, whether to terminate the A-12 contract immediately, or grant plaintiffs a windfall of resetting the entire schedule in response to plaintiffs' being late on the first delivery . . . . Government contractors do not gain contractual leverage via their defaults.[84]

We agree.  The effect of plaintiffs' argument is the Navy should anticipate the need for reestablishing new dates at least five years into the future, and we and do not view the DeVito waiver rule so broadly as plaintiffs claim.  At most, the court of appeals' reference to DeVito meant that Government waived its right to terminate plaintiffs for missing the original first flight date in June 1990 by "permit[ting] [the] delinquent contractor[s] to continue performance past [this] due date."  McDonnell Douglas, 323 F.3d at 1019.

A waiver generally is considered an intentional relinquishment of a legal right.  A finding under DeVito that the Navy waived its right to terminate plaintiffs for default in this case would assume irrational behavior on the Navy's part.[85]  That is, the Navy must have intentionally relinquished its right to enforce the entire schedule by issuing P00046, then chosen to reset only the missed delivery date and the remaining FSED dates.  P00046 contains boilerplate language

---

[84] This is a version of the strawman fallacy, but it shows why a definable and measurable schedule is the more reasonable and pragmatic means of resolving this issue.

[85] We do not overlook the possibility that the Navy, like many contractors, could have fallen into a trap for the unwary and suffered unintended consequences.  Contractors are presumed to know and understand the court-driven complexities of their actions during contract performance; the Government should be equipped to accept those risks as well.

that may protect against such a result.  Having stated new dates for the eight aircraft, the modification stated, "all other terms and conditions of the contract remain unchanged."

A showing of detrimental reliance is necessary to prove waiver of a schedule.  DeVito, 413 F.2d at 1154.  We find no such prejudice to plaintiffs.  On July 12, 1990, the contracting officer advised plaintiffs in writing that their failure to meet first flight "could jeopardize performance of the entire FSED effort."  The Navy asked the contractors to submit plans to meet the schedule for the entire program. Plaintiffs did not respond.  The Navy recommended a schedule that projected delay in all delivery dates, including an eighteen-month slip in TECHEVAL.  Still, plaintiffs would not agree to a bilateral modification.  Plaintiffs were well aware then that the Navy was concerned about schedule issues and that the entire program could be cancelled by the Department of Defense.

Most of the cases to which plaintiffs refer in support of the schedule waiver theory are factually and legally distinguishable.  See, e.g., Sipco Servs. & Marine, Inc. v. United States, 41 Fed. Cl. 196 (1998); Robert E. Moore Constr., AGBCA No. 85-262-1, 90-2 BCA ¶ 22,803 (Apr. 25, 1990).  In Sipco, this court found the agency waived the contract completion date by allowing the contractor to continue deliveries, though deliveries were late.  41 Fed. Cl. at 211. Moreover, the court found that the Government's unilateral modification, which set a new contract completion date, was not "reasonable from the standpoint of the performance capabilities of the contractor."  Id.  In Robert E. Moore, the Government did not satisfy its burden of proving reasonableness of a new delivery date after it had waived an older date.  90-2 BCA at ¶ 22,803.  The parties were therefore operating without a delivery date, thus the termination for default for failure to deliver was not justified.  Id.  These and similar board decisions are examples of a Government waiver after contractor default.

A reason it is difficult to apply such cases to this one is the important distinguishing factor in DeVito and other cases finding waiver – timing of the missed delivery date.  In DeVito, the contractor missed the final delivery date; waiver occurred after the contractor delivery default.  The Government waived an old delivery deadline by not issuing one, leaving the contractor without notice of how much time was left for performance.  Whether a notice to cure or a reestablished schedule of completion, these cases seem to address a similar commonsense requirement – notice.

Plaintiffs' argument that the Government waived its right to terminate tends to contradict the law of this case.  They have not addressed the Circuit's implied ruling that the Navy reestablished its right to terminate for default by issuing P00046.  See McDonnell Douglas, 323 F.3d at 1019.  If the court of appeals had found that the Navy waived the entire schedule, it would not have remanded the case for this court to "determine[] . . . the contract completion date."  Id. at 1018.

The effect of plaintiffs' waiver argument is that defendant's failure to establish an

ultimate contract completion date disposes of the Government's right to terminate. Not having established or reset a schedule for the entire contract after the DeVito waiver in 1990, defendant could not use failure to make progress as an incidence of default during the contract's pendency. This would be a harsh result. More importantly, however, such an interpretation would neutralize the Circuit's discussion of "tangible, direct evidence" needed to consider whether termination was justified. McDonnell Douglas, 323 F.3d at 1017. We do not interpret the Circuit's remand or existing case law so strictly.

## B.  OVERLAPPING SCHEDULE

Plaintiffs assert that if the original delivery schedule to contract completion was not waived, the Navy's issuing P00046 created an overlapping schedule impossible for the contractors to meet. Under the original schedule, the fourth aircraft of Lot I and modified first flight would apparently be due the same month, December 1991. See supra note 21.

The Government points to the Changes Clause of the contract, which requires plaintiffs to inform the Navy within twenty days of any actions or inactions they consider to be changes to the delivery schedule. Plaintiffs did not file such notifications. After plaintiffs missed the delivery date in June 1990, the Navy asked them to propose a new contract schedule. They refused, because for the contractors, "global issues" facing the A-12 program in mid-1990 took precedence. Plaintiffs did not want a binding schedule until these matters were resolved. According to defendant, plaintiffs therefore "acquiesced" in the continued enforceability of the original schedule.

The overlapping schedule offered by the Government as a basis for assessing default is unreasonable and likely unenforceable. The A-12 contract was designed as a long-term research and development effort, structured so that each period of performance built upon preceding work. Progress cannot be assessed in relation to milestones, but only in comparison to the entire contract effort. See McDonnell Douglas, 323 F.3d at 1016. The Government contends that the Lot I schedule remains in effect because that portion of the original contract was not changed by P00046.[86] In other words, the Lot I schedule remains in effect and plaintiffs would not make the deadlines provided there. This means production aircraft would be due before some of the

---

[86] The P00046 modification does not have a milestone built in for completion of the contract or a date at when the fourteenth and final aircraft would be delivered. The modification addressed only the schedule for delivery and testing on the first eight planes. Presumably, Lot I would have begun after the contractors delivered eight prototypes to the Navy's satisfaction. However, the schedule offered by the Government set delivery for the first FSED airframe in December 1991 and plane nine, the first aircraft in Lot I, remained due June 1991. Lot I would commence six months before the first test aircraft was to be delivered.

prototypes.  Application of the contract in that manner would be nonsensical.

Plaintiffs other argument on this issue is breach of contract.  The contractors assert that defendant's argument regarding enforcement of the Lot I schedule as drafted breaches their contract right to a "sequential" delivery schedule.  If the contract guaranteed plaintiffs a sequential schedule, however, P00046 itself would be unreasonable and unenforceable.  Without the modification, the contract's sequential order would remain.  Apparently, plaintiffs made a version of this argument to the Federal Circuit and it was rejected.  The appeals court ruled that P00046 was reasonable and enforceable.  See id. at 1018-20.

The Navy probably could not have enforced the Lot I delivery dates, but it does not seem necessary to get that far into the analysis.  The yardstick approach employs a schedule that we know to be reasonable and enforceable because the Circuit has so ruled – that is, P00046.

The Lisbon review takes a realistic look at the schedule that the parties were working toward at termination.  Failure to make progress against an overlapping schedule would not be a reasonable basis for default.  Not only would it be unfair, but also it would be inimical to the contract's purpose, to design, then manufacture and test successively more technically complex stealthy aircraft for the Navy's fleet.  This is the main reason that we are left with the "yardstick approach."

## C.  CONTRACT COMPLETION DATE

This Opinion has addressed plaintiffs' arguments that the Navy waived the contract schedule and that the schedule was rendered "nonsensical" by the P00046 change order.[87] Plaintiffs offer the additional claim that the contract had no completion date for the "entire contract effort" at termination, leaving no possibility that the contracting officer reasonably concluded the contractors would not complete the work on time.

No one expected to enforce the Lot I schedule.  Plaintiffs base their theory in part on this finding.  See McDonnell Douglas, 50 Fed. Cl. at 317-18 (citing Captain Elberfeld's testimony). If the Circuit had affirmed the ruling that P00046 was reasonable and enforceable because the

---

[87] The schedule for design, manufacture, testing, and production of the A-12 aircraft was to be performed in sequence.  This is typical of research and development contracts, as compared to construction contracts or contracts calling for periodic delivery of identical end items.  McDonnell Douglas' arguments assume that this sequential approach to performance was a contract requirement.  See McDonnell Douglas, 35 Fed. Cl. at 362 (noting that "[e]ach FSED aircraft would test different characteristics of the A-12; stealth capabilities would be verified in the 'fully capable, fully equipped' eighth aircraft that would serve as the basis for the production lots.").

entire contract had no schedule to completion, the appeals court would not have asked us in the same opinion to find a contract completion date. Captain Elberfeld's comments meant only that no one was considering Lot I or TECHEVAL, or any other dates at termination. Only P00046 was on the table. This court's review of "events, actions, and circumstances leading to termination" must exclude considerations of what might have been expected up to five years later.

The contract had no completion date at termination, seemingly leaving the court without a basis for finding a reasonable belief on the part of the contracting officer that the contractors would not complete the work on time. However, the appeals court did not rule that we should reject the Lisbon test if no contract completion date applies. The contractors acknowledge that such a reading is merely implicit in the remand decision. The Circuit was aware of both parties' interest in a contract completion date, which apparently was argued strenuously on appeal. The Federal Circuit did not suggest that Lisbon would not apply in such event, but explained repeatedly that the trial court should apply Lisbon.

Many cases to which plaintiffs refer are not helpful, given our facts. They involve the complete absence of any schedule for the contractual work.[88]   Plaintiffs also argue Electronics of Austin, a Board case similar to McDonnell Douglas. See Appeal of Electronics of Austin, ASBCA No. 24912, 86-3 BCA ¶ 19,307 (Aug. 14, 1987). In Austin, the Government had waived the performance schedule, and "there was no time frame within which [the plaintiff] had to perform." Id. For that reason, the Board found plaintiff could not be terminated for failing to make progress. The Federal Circuit distinguished Austin from this case because in McDonnell

_____

[88]   See Appeal of Lanzen Fabricating, Inc., ASBCA No. 40328, 93-3 BCA ¶ 26,079 (May 24, 1993) (Government's right to terminate for default may be defeated by government conduct after default "which either condones the default, or encourages or asks for continued performance, or fails to set a new delivery schedule"); Appeal of M.V.I. Precision Machining, Ltd., ASBCA No. 37,393, 91-2 BCA ¶ 23,898 (Mar. 15, 1991) (default termination of supply and service contract overturned because the Government did not establish a "valid and subsisting delivery schedule" and the contractor therefore "could not be late in making delivery in accordance with . . . [a] nonexistent schedule or in making progress under such [a] nonexistent schedule"); Appeal of Motorola Computer Sys., Inc., ASBCA No. 26794, 87-3 BCA ¶ 20,032 (July 15, 1987) (default termination of supply and service contract reversed upon finding that "with no performance schedules in existence, in accordance with which [the contractor's] progress could be measured, the termination . . . was improper") Appeal of Humphrey Logging Co., AGBCA Nos. 85-203-3, 85-181-3, 84-359-3, 85-3 BCA ¶ 18,433 (Sept. 30, 1985) (default termination of construction contract overturned because the delivery schedule was waived and no schedule ever reestablished). Where the contract expires but the contractor continues to work with no new completion date to measure progress, a much simpler analysis presents itself.

Douglas, the appeals court found a "specified delivery schedule." See McDonnell Douglas, 182 F.3d at 1332. The schedule "includ[ed] the delivery date of the first FSED aircraft in December 1991. . . . Therefore, the [A-12] contract imposed a duty on Contractors to make such progress so as to not to not endanger performance." Id.

The Circuit ruled that plaintiffs had a duty to make progress because the contract contained "a specified delivery schedule, including the delivery of the first FSED aircraft in 1991." Id. This ruling supports the yardstick approach discussed above. If plaintiffs were obligated to make progress against the portion of the contract that was enforceable at the time, the P00046 modified schedule was an appropriate measure of that performance. See McDonnell Douglas, 182 F.3d at 1331-32 (ruling that plaintiffs were required to make progress toward an "ultimate end item" if not to contract conclusion, where funds had not been obligated to the entire contract).

## IV.  ADEQUATE ASSURANCES

The Government raises plaintiffs' lack of adequate assurances again, apparently on the basis that such a failure operates as an independent incident of default. That is, the contractors did not provide the Navy adequate assurances of timely performance in response to the cure notice. The judgment in this case moots defendant's alternative argument that plaintiffs did not provide adequate assurances to the contracting officer after receiving his notice to cure. This court's views on that issue have not changed. The findings of fact and conclusions of law related to adequate assurances are incorporated herein by reference. See McDonnell Douglas 50 Fed. Cl. at 321-23.

Defendant believes the contractors' admission that they would not meet the delivery schedule or certain technical specifications required by the contract demonstrates lack of adequate assurances as a matter of law. We ruled in 1996 that the contractors did not repudiate the contract. See McDonnell Douglas, 35 Fed. Cl. at 377. The Government did not view the contractors' actions in this manner. Id. Admiral Morris did not believe that the contractors would not perform; he wanted an opportunity to work out the problems "within the boundaries of the contract." Id. n.31. Witnesses for the Government and for plaintiffs confirmed that the contractors intended to complete the contract.

A traditional repudiation claim required proof of a "positive, definite, unconditional, and unequivocal manifestation of intent . . . not to render the promised performance when the time fixed . . . by the contract shall arrive." Id. (quoting Cascade Pac. Int'l v. United States, 773 F.2d 287, 293 (Fed. Cir. 1985)). The Government points out that since the 1996 ruling, a new view of anticipatory repudiation has emerged. The modern rule acknowledges the Government's right to obtain assurances of timely performance in response to a justifiable cure notice and to declare the contractor in default for failure to provide such assurances. See Danzig v. AEC Corp., 224 F.3d 1333 (Fed. Cir. 2000).

Danzig was an issue during the last trial.  We discussed its application to this case at 50 Fed. Cl. at 321-23, pointing out that "[n]one of [Danzig's] facts is present here."  Id. at 322. Pertinent excerpts from that discussion follow:

> In response to the cure notice issued by the Navy, the contractors stated that they were committed to the program and were providing a response to the concerns raised by Admiral Morris.  The contractors addressed Admiral Morris' cure letter and provided additional information about the progress of the program.  Certain specifications and delivery schedules would not be met, but the contractors explained why this was so.  They alleged that certain requirements were impossible to satisfy, for example.  Unlike AEC, McDonnell Douglas and General Dynamics continued to perform until they were terminated for default.  They were spending between $120 and $150 million per month on the A-12 contract.  . . .

> Admiral Morris did not view the contractors' response to the cure notice as failing to provide adequate assurances.

> The Government points to the contractors' request for equitable restructure of the A-12 contract as evidence that their financial situation would not permit the contractors to complete this contract.  The proposal for restructure was not a response to the cure notice.  It was a request for financial assistance.  It was not included with the cure notice response but was a separate document with a separate cover sheet.  Admiral Morris took notes at a January 2, 1991 meeting with the contractors.  He records Mr. Anders, Chairman-Elect of General Dynamics, as stating, "[b]oth companies committed." [Under Secretary] Yockey agreed that contractors were "mov[ing] in the right direction."  Failure to give adequate assurances does not appear in the termination notice as a ground for default.  While the contractors wanted a restructured program they did not state they would suspend work on the A-12 contract.  John McDonnell, CEO of McDonnell Douglas, testified that the contractors "weren't about to abandon [the A-12 contract]."  Admiral Morris testified that he "would not have terminated the contract on the 7th of January if I got the authority to give it one more try."

> Plaintiffs did not repudiate this contract.  Admiral Morris did not terminate the A-12 contract because the contractors did not give adequate assurances.

Id. at 322-23.

Following this court's ruling on adequate assurances, defendant raised the issue twice before the Federal Circuit.  Defendant wrote:

> Government officials were entitled, as a matter of law, to rely upon the assurances

of the contractors' most senior management that . . . .they would not perform the existing contract in determining whether the program should be continued, as well as whether the contractors were in default. . . .  Indeed, the default may be sustained solely upon the basis of the contractors' anticipatory repudiation of the existing contract in their formal response to the cure notice.

Gov't Brief to Federal Circuit 40 (May 24, 2002).  The Government also briefed this argument extensively in its petition for rehearing:

The contractors' oral and written statements in the wake of the cure notice unambiguously gave the Government no "continuing sense of reliance and security that the promised performance . . . [would] be forthcoming when due . . . .  Given this, AEC requires, as a matter of law, that the judgment sustain the default be affirmed. . . .  The Panel's failure to mention the substantive holding of AEC creates the impression that AEC may not present the law of the Circuit.

Gov't Combined Pet. for Rehearing and Rehearing en banc 5, 6-9 (June 16, 2003).

Defendant contends that the Federal Circuit vacated this court's rulings on the alternative basis that the contractors failed to provide adequate assurances.  The 2003 opinion of the appeals court is best understood as leaving open the question of adequate assurances, the Government urges.  The remand order does not support such a conclusion.  The appeals court gave no direction whether we must address defendant's alternative ground for default, yet it remanded the case to apply Lisbon.  See McDonnell Douglas, 323 F.3d at 1024 ("[B]ecause the Court of Federal Claims did not apply the controlling standard under Lisbon to this case, we vacate its ruling that the default termination was justified and remand for further proceedings consistent with this opinion.").

The law of the case doctrine prevents further consideration of adequate assurances in these circumstances.  See, e.g., Am. Satellite Co. v. United States, 34 Fed. Cl. 468, 480 (1995) ("It is well-settled that if the decision below is correct, 'it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.'") (quoting Helvering v. Gowran, 302 U.S. 238, 245 (1937), reh'g denied, 302 U.S. 781 (1938)).  "If the Federal Circuit had accepted defendant's argument . . . it would have affirmed this court's decision on other grounds; the remand order would have been moot.  It is reasonable to assume that the Federal Circuit rejected the [argument]."  Am. Satellite, 34 Fed. Cl. at 480.

Although the Federal Circuit's remand did not address specifically the adequate assurances argument of defendant, further consideration of the issue by this court is precluded by the Circuit's opinion.  The Circuit would not have remanded the case for us to apply Lisbon if an alternative reason to sustain the default termination existed.  Such a gesture would not have been useful.

We have no reason to evaluate the adequate assurances issue differently in any event. The factual findings upon which the earlier ruling depends have been affirmed, or they have not been called into question by the Federal Circuit.  The Government has not offered evidence to cause us concern about the prior rulings on adequate assurances.

## V.  LOSS ADJUSTMENT

Federal Acquisition Regulations give the Government the right to a "credit" for losses the contractors would have incurred had the contractors performed to completion.  See FAR 49.203; McDonnell Douglas Corp. v. United States, 37 Fed. Cl. 270 (1996) (explaining application of the loss adjustment clause).  We held in 1996 that the loss adjustment issue was so intertwined with plaintiffs' arguments relating to superior knowledge and state secrets that neither that matter nor plaintiffs' claim for lost profits could be resolved safely.  Id. at 272.

The Federal Circuit declined to address the merits of this issue in 1999, stating it was not yet ripe because the question of default remained unresolved.  McDonnell Douglas, 182 F.3d at 1329-30.  The Circuit vacated the rulings on plaintiffs' superior knowledge claim, as well as those for loss adjustment and profits, speculating that the passage of time may have lessened the risks involved.  Id. at 1330; see McDonnell Douglas, 323 F.3d at 1013 (noting the Circuit's ruling vacating this court's loss ratio ruling on earlier appeal).

We readopted the loss adjustment ruling that this and other issues tied to plaintiffs' superior knowledge claim could not be tried because the passage of time did not lessen threats to national security.  McDonnell Douglas Corp. v. United States, No. 91-1204C (Mar. 1, 2001) ("All of the reasons established by [this court's] December 1996 opinion persist.").  We denied the Government's motion for reconsideration in April.  The default trial began later that spring.

The 2001 opinion following trial dismissed plaintiffs' superior knowledge claims upon finding that the Government properly invoked the state secrets doctrine.  McDonnell Douglas, 50 Fed. Cl. at 324-25.  We concluded that "[i]ssues involving superior knowledge cannot be litigated safely.  Defendant's argument that it is entitled to a loss adjustment pursuant to FAR 49.203 and plaintiffs' lost profits argument are moot."  Id. at 325.

The Circuit affirmed this court's rejection of the contractors' superior knowledge claim. Noting that the Government owes a duty to disclose certain "critical information" to a contractor, "well-established precedent demonstrates that, when a properly invoked claim of State Secrets privilege undercuts a civil litigant's opportunity to prove its case, the interests favoring the protection of the state secret always prevail."  McDonnell Douglas, 323 F.3d at 1024.  The Federal Circuit did not address loss adjustment arguments specifically.  The Government contends this is so because we sustained the default, and defendant did not argue it on appeal.

Defendant asserts the court may enforce the A-12 contract's mandatory loss adjustment

provision because it is no longer tied to superior knowledge.  That is, because we dismissed plaintiffs' superior knowledge defense, plaintiffs cannot rely on it to argue against this court's application of a loss adjustment.  Plaintiffs lack a basis for invoking the doctrine as a defense to enforcement of the provision of the A-12 contract that mandates application of a loss adjustment.

These are reasonable arguments,[89] but they are legal arguments that we have no need to address at this stage given the judgment entered below.  An adjustment under FAR presumes conversion to termination for convenience of the Government.  Because we sustain the default termination under <u>Lisbon</u>, defendant's loss adjustment argument is moot.

## CONCLUSION

This case demonstrates that the contracting officer may have a de minimis role in some circumstances of government procurement, rather than the central role that most contractors assume.[90]  The contracting officer need not make termination decisions for the same reasons that a reviewing court may consider after termination.[91]  So long as information to support the

---

[89] Attorneys for McDonnell Douglas, for General Dynamics, and for the United States have provided outstanding advocacy at the trial level through many years of difficult litigation.  Their efforts have assisted the court immeasurably.

[90] Contractors are accustomed to regarding the role of a contracting officer as a central one under the Contract Disputes Act.  For example, case law permits the Government to repudiate otherwise legitimate contracts because an official given apparent authority is not the contracting officer.  Policy reasons for this practice may be clear, but it gives the contracting officer an exaggerated position in the experience of many contractors.

[91] The Government need show only that a contracting officer acting reasonably with the benefit of information available to "the Government" at termination could have been justified in terminating the contractor for default.  The information available to the Government need not have been known to the hypothetical contracting officer or, presumably, to the contractor, if a contracting officer could have found himself feeling insecure about contract completion as a result.  He need not have included the reasons for his insecurity in the notice to cure or notice of termination.  <u>See, e.g.</u>, <u>Divecon Servs., LP v. Dep't of Commerce</u>, GSBCA No. 15997, 04-2 BCA ¶ 32,656 (June 22, 2004) (holding "[w]hether a reason was cited by the contracting officer or even known to him at the time of termination is immaterial.  If a valid basis for termination for default existed at that time, we will uphold the decision.") (citing <u>Empire</u>, 362 F.3d at 1357; <u>Kelso v. Kirk Bros. Mech. Contractors, Inc.</u>, 16 F.3d 1173, 1175 (Fed. Cir. 1994); <u>Joseph Morton Co. v. United States</u>, 757 F.2d 1273, 1277 (Fed. Cir. 1985); <u>Pots Unlimited, Ltd. v. United States</u>, 600 F.2d 790, 793 (Ct. Cl. 1979); <u>ESC Polytech Consultants, Inc. v. Gen. Servs. Admin.</u>, GSBCA No. 12509, 95-2 BCA ¶ 27,629 (Mar. 31, 1995)).

contracting officer's decision was available to the Government at termination, this is sufficient to rule whether the contracting officer reasonably terminated the contract for default for failure to make progress.

The parties had a mutual understanding that this contract would take many years to complete.  It was an open-ended contract, as Captain Elberfeld explained:  The "final act" of a research and development contract "depend[s] on what they were doing and what they were having problems accomplishing . . . .  Until you get to the end, you don't know what the last step is."   Yet the Government decided to terminate this contract less than three years into performance.

The contractors had reason to expect the Government to approach this contract as it had before, and particularly as it has since.  William Anders, General Dynamics' chief executive officer, commented, "[w]e jointly created a bad contract."  We have a "mutually bad deal."  Few would disagree with that judgment.  Mr. Anders added, however, "[the] Government has a responsibility also to fix the contract."

The law does not require the Government to help "fix the contract."  The Government can point to reasons in retrospect why plaintiffs were not making the progress that some officials hoped and perhaps expected.  So long as those reasons form a rational basis for a reviewing court to uphold defendant's decision to terminate, the court must do so.[92]

Defendant's motion for judgment upon additional findings is GRANTED.  Plaintiff's cross-motion is DENIED.  All pending motions necessarily decided by this ruling are moot and therefore DENIED.  The Clerk of Court will enter judgment for defendant.  No costs.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge

---

[92] The reviewing court may decide whether a contracting officer's belief would be reasonable if it can "decide the actual performance that the contract requires and the amount of time remaining for performance."  McDonnell Douglas, 323 F.3d at 1017 (citing Lisbon, 828 F.2d at 766).  The case turns on whether the Circuit's remand meant for the clauses, "entire contract effort" and "contract completion date" to mean exactly what they appear to mean – the contractors' expansive view; or whether the remand permits our use of a more compact yardstick – coinciding with the Government's restricted view.  The Government did not establish a contract closing date and the contracting officer did not conduct a Lisbon analysis prior to termination.